PRINCESS FURNACE CO. v. VIRGINIA-CAROLINA CHEMICAL CO.

(Circuit Court of Appeals, Fourth Circuit. June 12, 1914.)

No. 1196.

CONTRACTS (§ 352\*)—ACTION FOR BREACH—DIRECTION OF VERDICT.

In an action for breach of contract, where the breach is proved and there is exact and uncontradicted proof as to the amount and date of the losses sustained by plaintiff, it is not error to direct a verdict both for damages and interest.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1200, 1828; Dec. Dig. § 352.\*]

In Error to the District Court of the United States for the Western District of Virginia, at Roanoke; Henry Clay McDowell, Judge.

Action at law by the Virginia-Carolina Chemical Company against the Princess Furnace Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Benjamin Haden, of Fincastle, Va., for plaintiff in error.

David H. Leake and Robert E. Scott, both of Richmond, Va. (Scott & Buchanan, of Richmond, Va., on the brief), for defendant in error.

Before KNAPP and WOODS, Circuit Judges.

KNAPP, Circuit Judge. The plaintiff in error, defendant below, is a Virginia corporation which operated a blast furnace at Glen Wilton,

---

Va , 'and in connection therewith maintained a desulphurizing plant for the extraction of sulphur from pyrites cinder and nodulizing the same for use with its raw ores in the production of pig iron.

The defendant in error, plaintiff below, is a New Jersey corporation which was engaged, among other things, in the reduction of pyrites ores and extracting sulphur therefrom for the manufacture of sulphuric acid, leaving a by-product known as pyrites cinder which contains a large percentage of iron. It maintained several plants, one of which was located near Lynchburg, Va., and another at Richmond, Va., known as the Allison & Addison plant.

Pyrites ores are of two sizes or classes, namely, one known as lump and the other as fines, and each class requires a different furnace for its treatment. Lump ores were treated at the Allison & Addison plant and fines at the Lynchburg and other plants. The cinder produced from the treatment of lump ore is known as lump pyrites cinder, while that produced in the treatment of fines ore is known as fines pyrites cinder. The general term "Pyrites Cinder" embraces both classes.

In April, 1907, the parties named entered into a contract whereby the furnace company purchased the entire output of fines cinder from certain plants of the chemical company, amounting to approximately 1,000 tons a month, for a period of five years. Prior to June, 1909, the furnace company was in default under this contract, and a large amount of fines cinder accumulated on the hands of the chemical company, entailing a loss of some $6,000 for which the furnace company appears to have been liable. Various negotiations thereupon followed, with the result that a new contract was made under date of June 12, 1909, which is the basis of the present suit. The provisions of this contract, so far as they require recital, are substantially as follows:

The prior contract of April, 1907, was annulled without recourse or claim of damages by either party.

The chemical company agreed to sell to the furnace company all of its stock of cinder on hand at its plant known as the Allison & Addison plant at Richmond, and all of its stock of cinder at its plant near Lynchburg, together with all cinder that should be produced at these plants prior to June 1, 1912; and it was specified that the chemical company made no representations as to the amount or quality of its stocks of cinder then on hand, nor as to the amount or quality of cinder which it might produce during the period mentioned.

The furnace company agreed to purchase from the chemical company, and pay for at the rate of $1.25 per ton, a minimum of 500 tons of pyrites cinder per month, beginning with June, 1909, and to continue to order and receive cinder at the rate of not less than 500 tons per month during the life of the contract.

In case the furnace company failed to order and receive as much as a thousand tons of cinder in any two consecutive months, the chemical company had the option of revoking the contract and demanding payment from the furnace company of $5,000 as liquidated damages.

It will be observed that the first contract related specifically to "fines" cinder, while the second contract covered all the "cinder" output of two named plants, one of which produced only lump cinder. There may have been at one time some misunderstanding on the part of the

furnace company as to the kind of cinder which it had agreed to take, but the contract in that regard is perfectly plain, and the chemical company was entitled to have it performed according to its terms.

Shipments of cinder under this contract were begun about the date of its execution and continued from time to time, in varying amounts per month, until some time in November, 1910. There were no shipments after that date. In November, 1911, the chemical company, alleging that the furnace company had made default and become liable under the terms of its contract, served a notice of revocation and informed the furnace company that at the expiration of 90 days it would demand payment of the $5,000 liquidated damages provided in the contract. Thereafter in July, 1912, this action was commenced. The defendant pleaded the general issue and also filed a number of special pleas setting up various defenses. Upon the trial of the case, and after all the evidence was submitted, the District Court refused to direct a verdict for the forfeiture named in the contract, but did direct a verdict for actual damages in the sum of $3,115.20, together with interest in the sum of $1,238.50, or a total of $4,353.70.

This was the amount of damages shown by undisputed evidence which is summarized in the following statement:

|  | Lynchburg. | A. & A. |
|---|---|---|
| Stock on hand June 1, 1909 | 2,392 | 12,928 |
| Produced from June 1, 1909, to June 1, '12: |  |  |
| At Lynchburg plant...8,386 |  |  |
| Less used by company...3,038 |  |  |
|  | 5,348 |  |
| At A. & A. plant | | 8,175 |
|  | 7,740 | 20,103 |
| Total stock June 1, '09, and production to June 1, 1912 ...27,843 T |  |  |
| Per cent. to be shipped (as 18,000 tons are to 27,843 tons) 64.62 plus % |  |  |
| Tons to be shipped from each plant (if only 18,000 tons taken), on basis of 64.62% | 5,003 | 12,992 |
| Actually taken | 2,417 | 3,470 |
|  | 2,586 | 9,522 |

### Amount of Claim.

| | | |
|---|---|---|
| For handling 2,586 tons at Lynchburg | | $ 258 60 |
| For loss of 30 cents per ton on 9,522 tons at A. & A. plant | | 2,856 60 |
| | | $3,115 20 |

Interest at 6% as follows, viz.:

| | |
|---|---|
| Total to be taken in 3 years...18,000 tons | |
| Actually taken... 5,887 tons | |
| Balance not taken...12,113 tons | |

Actual taking equal to first twelve months leaving untaken 12,113 tons, less Lynchburg quota of undelivered 2,586 tons, and then leaving 9,522 tons of A. & A. cinder undelivered, at $1.25 per ton, equal to $11,908.75, of average due date of June 1, 1911, say from January 1, 1911, to February 25, 1913, interest at 6% for 1 yr., 8 mo. and 24 days..................................... 1,238 50

Total ......................................... $4,353 70

The assignments of error present three general questions, only one of which goes to the real merits of the controversy. It is contended by the furnace company that there was no violation of the contract on its part because the chemical company had consented to postpone shipments and in effect waived its right to cancel the contract and demand damages for nonperformance. A careful examination of the record satisfies us that this contention cannot be sustained. The numerous letters which passed between the parties indicate that the business of the furnace company was not prosperous, and consequently it was not in a situation to make use of the quantity of cinder for which it had contracted. The chemical company was asked to defer deliveries and thus give the furnace company an opportunity to take advantage of more favorable business conditions. Without going into the correspondence in detail, it is sufficient to say that the furnace company was seeking delay and the chemical company disposed to be accommodating. Shipments were in fact suspended at one time and another, but we find nothing which can be fairly construed as a waiver by the chemical company of its right to have the contract executed in accordance with its terms. The situation in this regard, as we see it, is summed up in a letter of the chemical company of September 18, 1911, which reads as follows:

"Shipments under this contract were suspended, as you know, at the urgent request of your company, although the Virginia-Carolina Chemical Company has always been ready and anxious to make shipments to your company in compliance with the contract.

"We now write to say that, in reply to your request to still further defer the resumption of shipments, we will be willing to defer shipments of cinder to your company until November 1st next, provided you will write and forward to us the inclosed letter stating that our noninsistence on your taking the cinder as provided for in the contract with your company shall in no way impair or annul our contract with your company and our rights under the same, and that you will begin to accept on or before November 1st next shipments of cinder in accordance with the contract and fulfill the requirements of the same thereafter; it being understood that the Virginia-Carolina Chemical Company is not in any way to be prejudiced by acceding to your request for indulgence now or heretofore, nor by your default in complying with this contract.

"We beg to add that the accumulation of cinder at both plants (the product of which are sold to you) has now become such that we are put to considerable expense in order to store it, and we shall look to your company to reimburse us for such costs as are thus incurred."

This communication makes it plain that the chemical company, appreciating the condition in which the furnace company found itself, was willing to grant additional time, provided the furnace company would state in writing that such extension should in no way impair or annul the contract in question, and that the furnace company would begin to accept shipments on or before the 1st of November following and thereafter perform all the requirements of its obligation. The furnace company failed to give such assurance, but replied to the effect that it could not undertake to meet the condition of the proposed extension because its furnace was shut down and it would be impossible to have it in blast within the next sixty days.

Again, on October 10th, another letter was written in which the following proposal was made:

"I am therefore willing to agree to extend the life of the contract a sufficient number of months to cover the various periods of time within which you have not taken the cinder, with the understanding that you will resume taking it as soon as you start your furnace up, said limit of continued cessation to be six (6) months from October 1, 1911, and with the further understanding that no action on our part, either heretofore or in the future, shall in any way change the conditions of the contract or any of our rights thereunder, except as to the extension of the time within which the said contract was to be fulfilled."

This proposition was not accepted and the reply of the furnace company disclosed a virtual refusal to accept further shipments at any definite time in the future, as the writer says:

"But I have not been able to arrive at any point where I could say that at such and such a date I will be in a position to take this material."

Thereafter, on November 8th, the chemical company served formal notice that on account of the "continued failure and refusal to order and receive, take, or accept, delivery of pyrites cinder, though repeatedly tendered to you, at any time or in any quantities, during this year," it exercised its right under the contract to cancel the same, and demanded payment of the alternative sum of $5,000.

Bearing in mind that nearly a year had then elapsed since the furnace company had ordered or been willing to receive any further consignments of cinder, we are clearly of opinion that the failure of the furnace company to meet its engagement was not excused by any consent or waiver of the chemical company, and that the latter was within its rights in giving notice of cancellation and demanding the payment of the stipulated forfeiture. In other words, the breach of the contract was established, and the liability of the furnace company to respond in damages followed in consequence.

It is nevertheless urged that the question of the amount of damages should in any event have been submitted to the jury, and that the trial court therefore erred in directing a verdict; and that this is especially so as to the item of interest included in the amount directed, because it is said that the question whether interest shall be allowed on damages rests in the discretion of the jury.

But this is not a case, like an action for personal injuries, where the damages are uncertain because they depend upon the differing judgments which may be formed upon facts and circumstances which it is the province of a jury to consider. This is an action for breach of contract, and, the breach having been proven, the damages of the injured party became a mere matter of calculation from definite and certain data. Assuming that the furnace company defaulted, as we hold to be established, there was exact and uncontradicted proof both as to the aggregate losses of the chemical company and the date when each loss occurred.

A verdict for the actual losses without interest, if the case had been submitted to the jury, would have been inadequate under the evidence adduced, and could have been set aside for that reason. In

other words, there was no question of fact to be determined, and that being so a verdict including interest was properly directed.

The errors assigned because certain testimony of witnesses for the furnace company was excluded are without substantial merit. The questions asked call for an expression of opinion as to the construction of the contract or the meaning of various statements appearing in the correspondence. The correctness of the ruling in that regard is not open to serious doubt. Besides, it is impossible to see that any prejudice resulted to the furnace company because these questions were not permitted to be answered.

The record indicates that the case was tried with great liberality toward the furnace company, and that the learned District Judge, in declining to enforce the stipulated forfeiture and giving judgment for damages on the basis outlined in the statement above quoted, took a considerate view of the furnace company's situation, and one of which it cannot justly complain.

We are satisfied that no reversible error was committed, and the judgment is therefore affirmed.