NATHAN BECKER and Others, Respondents, *v.* ARNSTAEDT & CO., INC., Appellant.

First Department, January 11, 1924.

Sales — action by buyer to recover for failure to deliver — damages — evidence — prevailing market prices cannot be proven by testimony of quotations made by business houses who would not sell at prices quoted — verdict is against evidence as to question of damages — error to admit written summary of plaintiffs' case.

In an action by a buyer to recover damages for the failure of the seller to deliver the goods purchased, the prevailing market prices cannot be proved by witnesses testifying to quotations which they had received from business houses unable and unwilling to sell at the prices quoted, and the verdict as to the amount of the damages suffered by the plaintiffs is against the weight of the evidence.

It was error for the court to admit in evidence over the objection of defendants' attorney a written summary of the testimony of one of plaintiffs' witnesses with reference to market prices which contained recapitulations setting forth the amount of damages upon different theories, and other facts, all of which in effect was merely a statement of plaintiffs' case and their argument as to figures which they considered should prevail.

APPEAL by the defendant, Arnstaedt & Co., Inc., from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 24th day of October, 1922, upon the verdict of a jury.

*Butcher, Tanner & Foster* [*William O. Gennert* of counsel], for the appellant.

*I. Gainsburg,* for the respondents.

MARTIN, J.:

It is alleged by plaintiffs that a contract was entered into with defendant, on or about the 15th day of May, 1919, by which defendant agreed to sell and deliver to plaintiffs between the date of the agreement and November 1, 1919, 400 pieces of broadcloth. The making of this contract is denied by defendant. It was admitted on the trial that 144 pieces of broadcloth were delivered. Plaintiffs maintain that those deliveries were made as part performance of the contract in suit. Defendant contends that they

were installment deliveries made on other contracts entered into during the same period.

By its verdict the jury found that the contract had been made, a finding for which there is support in the record; that only 144 of the contract quantity of 400 pieces of broadcloth were delivered and that defendant became liable to plaintiffs for damages.

Defendant contends that the verdict on all the issues is against the weight of the evidence; that prejudicial errors were committed in the admission and rejection of evidence over defendant's objection and exception, and that in any event the amount allowed as damages is excessive.

There appears to be reason for contending that the verdict is against the weight of the evidence on the question of damages, and that errors were committed in the admission and rejection of evidence.

To prove the damages claimed, plaintiffs relied on excerpts from defendant's books; the testimony of William F. Becker and Louis Becker, and that of another witness, who testified to the market prices prevailing during the alleged period for deliveries. On cross-examination the testimony of all plaintiffs' witnesses was very much shaken and its value greatly impaired.

During the presentation of plaintiffs' case, counsel offered in evidence many abstracts from defendant's books showing numerous sales, during the time for delivery under the alleged contract, of some of the grades of merchandise which plaintiffs allege defendant agreed to sell and deliver to them. These sales indicated that the prices testified to on behalf of plaintiffs as being the prevailing market prices were in excess of such market prices. Moreover, it appears that plaintiffs' witnesses obtained their information with reference to the prevailing market prices during said period by inquiring from persons engaged in selling similar merchandise, but who, though quoting prices, indicated they would not sell at the prices quoted, or had no merchandise for sale.

Plaintiff William F. Becker testified that one house known as Tiedemann & Sons quoted prices for similar goods through a representative whose name he did not know. He was unable to remember details. He said: "I asked him if he had any broad-cloths — any cloths for sale, and he told me that they were sold up, they had none for delivery."

Louis Becker, another member of the firm, gave similar testimony: "Q. Now did you, in the months of November and December, go around to these various commission houses and jobbing houses and acquaint yourself with market prices? A. Yes, sir. Q. What houses did you call on, if you remember, outside of jobbers?

A. Herman Brunner. Q. Herman Brunner is a jobber? A. Yes. Q. Give me a commission house? A. Botany Worsted Mills, Forstman & Hoffman, Buckley & Cohen. Q. Did they have any of those goods on hand? A. They were all sold up. Q. Then, your answer is they did not? A. No, sir. Q. Did any of them quote you any prices? A. They quoted prices."

Jacob Greenberg, a witness for plaintiffs, attempted to prove prevailing market prices, but his testimony is of very little value. He testified that in 1919 he was buying and selling goods, particularly broadcloths. His principal business consisted of dealings in three cloths — broadcloths, velours and serges. He was acquainted with Arnstaedt's fifty-five goods and IB quality, mentioned in the complaint. They were cheap goods. He bought some merchandise from Joe Korostoff, a manufacturer of cloaks and suits. He bought goods from I. R. Kafka and from a firm not now in business, Sipkin & Gorshen. He knew the market value of IB cloth, sixty inch, in November, 1919. It was three dollars and eighty cents and three dollars and ninety cents, and in December, four dollars and four dollars and ten cents. This IB, colors, in November was three dollars and ninety cents and four dollars. In December from four dollars and fifteen cents to four dollars and twenty-five cents. The fifty-five in colors was two dollars and ninety cents to three dollars. In November and December three dollars and ten cents to three dollars and fifteen cents and three dollars and twenty-six cents. That he called on Buckley & Cohen, Francis & Holmes and Theodore Tiedemann. None of them gave any prices. They said they were sold up; goods were very scarce; would not even talk about it. They refused to quote prices. He obtained a price from Buckley & Cohen, who were sold up in November for cloths similar to fifty-five and IB. They wanted three dollars and eighty-five cents for IB and two dollars and ninety cents for fifty-five; but their representative said, "What is the use of quoting; * * * I am just giving you the price, but it is no use, it is not for delivery, we are all sold up."

It appears from the record that none of the goods referred to as " IB color " were manufactured during the period in question; and that IB black cloth had been delivered to plaintiffs only.

On cross-examination Greenberg testified: " Q. Did I understand you to say that you bought some IB's? A. Similar to IB, and it might be I have, because jobbers change the style of them. Q. I understand you then correctly, when I understand you to testify that you actually bought IB's? A. Some I did buy, IB's, and some similar to IB's; it might be IB's, but the jobber changes the ticket and we don't know what mill it comes from. Q. Did

you know at the time who was the manufacturer of IB's? A. Yes, sir. Q. Did you have a market for IB's? A. Yes, sir. Q. Who was manufacturing IB's at the time? A. The Arnstaedt Company. Q. Why didn't you go to Arnstaedt and try to buy IB's? A. Because they won't open any new accounts. If you will allow me — at that time they only did business with the old accounts. Q. Do you know whether Arnstaedt was selling any IB's? A. Yes. Q. At that time? A. What time? Q. December or November, 1919? A. They were already sold up. Q. In IB's? A. That was the rumor in the market. Q. You did not take the trouble to go there and inquire? A. I was a new man in the business at that time when I went in partners with Mr. Burtinsky. * * * Q. You did not go to Arnstaedt to make any inquiries? A. No, sir. Q. Do you know what floor they were on? A. Impossible for me to remember. Q. You do not remember the name of the mill? A. No. It was Theodore Tiedemann's department. Q. Does it refresh your recollection any to hear me mention the name, Neponsit Mill? A. Never heard of them. There might be a mill, they might be a selling agent. Q. You heard of the Botany Worsted Mills? A. I did. Q. One of the finest mills in the country? A. I would not say that. Some mills make better cloths than they do. Q. Is it not a fact that the Botany Mills make nothing but fine worsteds? A. They make wool and worsteds. Q. But they do not make any cotton broadcloths like the Arnstaedt? A. The cloths I tried to buy from them they had no cotton in it. Q. Then, why did you go to the Botany Worsted Mills to get cloth like Arnstaedt's cloth if they did not make it? A. I could go there and try to get it. Q. But you knew before you went there that they did not make it? A. No, I did not. Q. You only found that out by going there? A. I only found out by going there. * * * Q. This is a very cheap kind of cloth, isn't it? A. Yes. Q. And the prices of this cloth were very much lower than serges and pure woolens? A. A different kind of cloth. * * * Q. You mentioned serges, and we have in this case a serge at $3.25 or $3.50 bought from Aaron Smith & Bro. Is it not a fact that of serges or any good cloth there are various grades and qualities. A. Exactly. Q. It is a fact, is it not, that you could have bought certain kinds of serges at a price less than the price paid for the broadcloth, IB, the 55? A. Yes. Q. And serges at that time, in 1919, ran as high as how much a yard? A. As high as $2.93, $3.25, $3.50. An 18-ounce serge would bring more money than a 9-ounce. Q. Broadcloth you don't buy by the weight, do you? A. No, just buy it by quality. * * * Q. In view of your experience in the woolen business, would you say that a man that was

looking for a broadcloth like the Arnstaedt would buy serge as a substitute? A. Impossible."

By the testimony of several disinterested witnesses, engaged solely in buying and selling cloth similar to the cloth plaintiffs allege defendant contracted to sell them, the prevailing market prices were established, and the testimony as to market prices of plaintiffs' witnesses was shown to be incorrect. Furthermore, the testimony of defendant's witnesses furnished additional proof of the unreliability in other respects of the testimony submitted by plaintiffs.

Defendant produced as a witness Hugo Daniel, the selling agent of Theodore Tiedemann & Sons, who handled the output of the Neponsit Mills from whom plaintiffs testified they had received quotations. Daniel contradicted plaintiffs' witnesses. He said he was the selling agent of woolen goods, employed by Theodore Tiedemann & Sons at No. 351 Fourth avenue; that he was with them during the year 1919; that his office at that time was on the ninth floor; that he did not have an office on the first floor; and that Tiedemann & Sons had no office on the first floor. He was familiar with IB cloth made by the Arnstaedt people and had examined it. In November and December, 1919, his concern carried a cloth similar to IB cloth, which they designated as W cloth, and that IB cloth and W cloth were very similar. He was also familiar with Arnstaedt fifty-five cloth. He knew the kind of cloth it was and in November and December, 1919, his house carried a cloth similar to Arnstaedt's fifty-five cloth, designating it as JW. The JW and fifty-five cloths were cotton warped with shoddy face. The W cloth is a cotton warp, a better face. The price of W cloth during November, 1919, was one dollar and sixty-five cents. He further testified: " Q. You sold goods from stock in November, did you not? A. Yes. Q. And in December? A. Yes. Q. Number W? A. Yes. Q. At what price? A. $2.30. * * * Q. Delivered from stock, $2.30? A. If I had the stock. * * * Q. Do you understand it now? A. I wish to say that we manufactured goods which were coming in every week and every month, and when they come in we ship them out at $2.30. This is what I mean to say. That was in October and November. Q. How about December? A. December, too. * * * Q. Those same prices? A. Yes. Q. How about your JW? A. Our price then was $1.65 under the same conditions. Q. In November and December? A. Yes. * * * Q. Before that, in the year 1919, what was your price for JW? A. That depends. Which month? Q. Well, beginning with May, May and June? A. Well, up to about the middle of May it was $1.46½. Q. After that? A. It was $1.65 which held good during the year almost. It held

good at $1.65 except for special purposes.   Q. Were you familiar with prices of this merchandise in New York in November and December, 1919?   A. Yes.   Q. And can you say that the price you have given at $2.30 for your W cloth was a fair market price in those months in New York City?   *   *   *   A. It was considered a fair price, a right price.   Q. Have you any of your sales slips here?   A. I have got them."

This witness on redirect examination testified as follows: " Q. During these months Neponsit was selling direct in New York? A. Yes.   Q. And at the same price as you were?   A. The same price.   Q. Did you ever make a quotation of $4 a yard for W cloth November, December, 1919?   A. I could not.   *   *   *   Q. Did you ever make a quotation in November, $2.75 for JW cloth?   A. In November, no, sir.   Q. Or December?   A. No, sir."

One of the plaintiffs' witnesses testified that he purchased from Sanford & Russell goods similar to the cloth contracted for, and described the goods as their No. 1550.   Defendant produced Thomas J. Monaghan who testified that he was a woolen salesman and had been in that business with Sanford & Russell for twenty-one years; that his firm did not deal in any such goods; that he sold goods to N. Becker & Son on or about the sixth day of November; that the goods were known as 3100 black; that defendant's Exhibit C for identification, defendant's cloth, and defendant's Exhibit F for identification, the latter being a sample of his own cloth, were not at all similar; that one was cotton warped and the other cotton carded.   The cotton carded cloth is that of his house. Defendant's Exhibit F is cotton carded and weighs twenty-two ounces to the yard.   Defendant's Exhibit C is a cotton warped cloth and, although it is hard to gauge the weight, it is about twelve or thirteen ounces to the yard.   It was just like giving a man an overcoating cloth for a suit.   Defendant's Exhibit F, the cloth sold by his concern, is of much better quality than defendant's Exhibit C.   They are not similar cloths, " one is supposed to be a kersey, used for overcoating — that is my cloth,   *   *   *   and the other cloth I presume is used for ladies' suits or dresses, because you could not use that cloth for overcoating.   *   *   *   I cannot give you the value of cloth like that, because it is a cloth that we would never make and never sell.   I never knew of it.   I never heard of it.   I would not sell a cloth like that."

He thus contradicted most substantially the testimony of plaintiffs that they bought similar goods from Sanford & Russell.   It was upon this and similar evidence that plaintiffs based very important testimony of value and on which testimony the prevailing market prices accepted by the jury were alleged to have been established.

Plaintiffs' witnesses merely repeated quotations which, as they asserted, they had received from houses unable and unwilling to sell at the prices quoted. This is not a proper basis for finding market price.

In *Palisade Curtain Co., Inc., v. Korn* (197 App. Div. 88, 90) this court said: " While the court, whether at Trial Term or on appeal, ordinarily is loath to disturb the verdict of the jury, upon conflicting testimony, there should be no hesitancy in setting aside a verdict where the undisputed evidence and the probabilities clearly indicate that it was contrary to the weight of the evidence."

In addition to the verdict being against the weight of the evidence, it was error to admit in evidence, over objection and exception, plaintiffs' Exhibit 12. This exhibit purports to be a summary of the testimony of plaintiffs' witness William F. Becker with reference to market prices. It is a tabulation of figures setting forth what plaintiffs claim with reference to quantities delivered and those not delivered; the range of prices for the different grades of goods, with recapitulations setting forth the amount of damages upon different theories, together with the amount concededly due to defendant from plaintiffs for merchandise delivered. The verdict was rendered by adopting the final figures on the basis of the " lowest " market prices set forth on this exhibit, recapitulation being given on a basis of a " low " and also on the basis of a " high " range of prices. It is in fact a statement of plaintiffs' case and their argument as to figures which according to plaintiffs should prevail.

Plaintiffs' attorney during the trial and again at the end of the case, made it quite clear that he appreciated the advantage of placing a paper containing such calculations before the jury. While its value to plaintiffs may not have been so fully appreciated by counsel for the defendant, he nevertheless protected himself by what we consider a sufficient objection and exception.

There was no justification for placing in evidence, over objection and exception, a statement containing figures showing the range of prices asserted to be the testimony given by one favorable witness for the plaintiffs, in columns parallel to others alleged to have been set forth in the contract. Nor can there be any justification for submitting a written statement of plaintiffs' case to the jury as plaintiffs contended it had been proved.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., SMITH, MERRELL and FINCH, JJ., concur.

Judgment reversed and new trial ordered, with costs to appellant to abide the event.