## PARROTT v. ALLISON et al.

District Court, S. D. New York.
Feb. 25, 1943.

956

George L. Madden, of New York City, for plaintiff.

Arthur W. Rinke, of New York City, for defendants.

BYERS, District Judge.

This is an action by a buyer who seeks damages for failure to deliver, pursuant to contract, 10 tons of Timbo powder.

The plaintiff compounds insecticides for agricultural uses, of which Rotenone is an essential ingredient, which is obtained from roots; the Far Eastern product is called Derris powder, while the South American product is called Timbo or Cube powder.

The Rotenone content of these powders, stated in percentage, determines the price.

The foregoing is taken from the opening statement of counsel for the plaintiff, and is not disputed.

The defendants are partners, engaged in importing from foreign countries these powders and other commodities.

The parties waived a jury and the trial was had to the court.

### Findings.

1. Jurisdiction is based upon diversity of citizenship; the plaintiff being a resident of Stamford, Connecticut, and the defendants being residents of the City of New York.

2. A contract was made between the parties on or about May 28, 1941, whereby the plaintiff agreed to buy and the defendants agreed to sell 10 tons of Timbo Powder at 18¢ per pound plus all expenses; i.e., custom's entry charge, cost of analysis, weighing charges, custom's duty, insurance (marine and war risk) and storage charges, if any. The price was subsequently increased to 19¢ per pound by consent of the parties.

3. The contract did not provide in terms that it was conditioned or contingent upon the arrival of the subject-matter at the Port of New York.

This finding is based upon conflicting evidence which will be discussed at this point.

### Discussion of this Finding.

The defendants' offer is thus stated in Exhibit 3:

"Incidentally, it might interest you to know that we have contracted for an additional 10 tons of Powdered Timbo Root for early June shipment, in the event the 5 tons we have sold you, turn out satisfactorily. These 10 tons cost us more than the first 5, and we have today given an option on them to one of our customers, but in the event the latter does not take up the option within the next few days, we will be very glad to let you have all or a portion thereof, should you so decide. These 10 tons, frankly, cost us 17¢, and we will this time want 1¢ per lb. profit. In other words, we would be glad to sell them to you @ 18¢ per lb., c. & f. New York, all expenses for your account.

"Yours very truly,

"Wm. M. Allison & Co.

"P.S. Since writing the above, we have just heard from the shipper of the Powdered Timbo Root, to the effect that the steamer on which he had planned to ship the 5 tons, scheduled to sail May 28, has been withdrawn and he cannot possibly have the goods ready for the steamer sailing on the 19th of this month. Accordingly, he will ship on the first boat, sailing the early part of June. We have given our consent to this request, there being no other alternative, if we want the goods; and we trust you will be in agreement.

"A & Co."

The parties agree that the foregoing offer was the subject of an oral acceptance at a meeting between the plaintiff and the defendant Crosby Allison at the office of the latter in New York City, on or about May 28, 1941. The plaintiff's version of the conversation is that he stated to the said defendant that he had come in to purchase the 10 tons of Timbo powder offered as above, if the option therein mentioned had not been availed of by the customer referred to; that Mr. Allison stated that his customer had not taken up the option and that the plaintiff could have the powder; that the customer's name was mentioned as that of the Chipman Chemical Company of New Jersey, and that nothing further was said on that subject at that time.

The next conversation was on or about August 8, 1941, between the same parties at the same place. The plaintiff said that he asked if the said Mr. Allison could give him anything more definite about the arrival of the 10 tons of Timbo powder, and that the latter said: "I don't recall having sold you that 10 tons. Are you sure about it?"

The witness continued: That he mentioned the name of the said Chipman Chemical Company and reminded Mr. Allison that the latter had not exercised the option re-

ferred to; whereupon Mr. Allison said that he would refer to his book, which he did, and then said to the witness: "You feel then that I sold you the material?" and the plaintiff replied: "Why, I most certainly do." Then Allison said: "All right. I will go through with it." Later on, when a dispute arose between the parties because of the non-delivery of the subject-matter of the contract, the said Mr. Allison stated that he had confirmed the purchase in writing and that in the communication it was stated that the sale was made subject to safe and sound arrival of the powder in New York.

In point of fact, there never was any such confirmation in writing, so that the witness Allison was mistaken in thinking that there had been, and in stating that the confirmation was conditional upon the arrival of the subject-matter.

It thus appears that Allison's memory was infirm in August of 1941 respecting the making of the contract three months earlier, in May of the same year; and that it was mistaken in February of 1942 with respect to the existence of any written confirmation and the form thereof. These lapses make it appear that the court cannot now rely upon his memory as to what was said between the parties when the contract of purchase and sale was made, so far as he wishes now to import something into the contract which is not stated in the original offer.

An earlier order for 5 tons was the subject of a letter written by the defendants to the plaintiff (Exhibit 1), which was accepted over the telephone, and confirmation is found in the defendants' letter of May 7, 1941 (Exhibit 2), the first paragraph of which reads as follows: "Pursuant to 'phone conversation with you today, we confirm having sold you, subject to actual arrival New York, the 5 tons of Powdered Timbo Root, which we have under contract for May shipment."

The omission from the tender of May 16, 1941, of the subject clause concerning arrival in New York, must be deemed to have been deliberate.

■ The conflict in testimony is therefore resolved in favor of the plaintiff.

This interpretation of the evidence is the more acceptable since this is not a case involving the destruction of the subject-matter of the contract while in transit; had that occurred, whereby the incidence of loss would have required determination, there might exist the occasion for more extended, if not more critical, examination into the subject.

■ Certainly the defendants may not successfully contend, that because safe arrival of the Timbo powder at New York was implicit in the contract, they cannot be held to have committed a breach even though the evidence is consistent with their having themselves caused their shipper to refuse to perform his contract with them.

4. The contract was never performed, and was therefore breached by the defendants.

5. The breach is deemed to have been established as of February 1, 1942. The date of the breach is difficult to fix, but certainly it occurred after January 14, 1942, because on that date as well as on December 18, 1941, the defendants are on record to the effect that they considered the contract to be in existence.

Reference is made to the following:

According to Exhibit 7, the defendants wrote to the plaintiff on December 18, 1941, in part as follows: "We regret to advise that we have no further information, since we spoke to you a day or two ago, relative to your pending order for Timbo Powder. We will not fail to advise you at once, when we have any news."

Under date of January 14, 1942, the defendants wrote to their shipper in Brazil in part as follows:

"Let us however cease these arguments and accusations. What we want are the 10 tons of Timbo Powder you owe us. What you ought to want is to preserve your reputation, and to hold the good-will of not only ourselves, but other merchants here, to whom you will probably want to sell over the years to come. The war is not going to last forever and present high prices will eventually come down again."

"P.S. We might add that the manufacturer to whom we long since sold these 10 tons of Timbo Powder due from you is so angry at what he considers willful breach of contract on your part, that he threatens to attach any shipment of Timbo Powder or other merchandise which you send to this country to any other buyer except him. Our customer means what he says, and is fully capable of paying whatever legal expenses are necessary in order to carry out his threat."

The reason that the breach is fixed as of February 1, 1942, is that the shipper in Brazil wrote to the defendants on January

4, 1942, with respect to a dispute which had arisen concerning the 5 tons shipment.

The defendants could have, had they so chosen, conformed to their shipper's demand for the balance he conceived to be owing from them. They elected not to do this, and thereby put themselves in the position of not being able to perform the contract in suit.

6. The market or current price of Timbo powder in New York during February of 1942 was 35¢ per pound.

7. The loss suffered by the plaintiff was the difference between the contract price as amended, of 19¢ per pound, and the said market price, or 16¢ per pound.

8. The charges payable by the plaintiff under the contract of purchase are agreed to be $339.50.

### Conclusion.

The plaintiff is entitled to judgment against the defendants in the sum of $3,200 less $339.50, or $2,860.50, with interest from February 1, 1942.

### Discussion as to Damages.

■ Section 148 of the Personal Property Law of the State of New York governs on this question. In part, that section reads:

"2. The measure of damages is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract.

"3. Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver."

In lieu of testimony on the subject of market prices for this commodity in New York during the month of February, 1942, it was stipulated that several individuals, engaged in the business in this city, were qualified to testify to market prices in New York City for Rotenone-bearing materials during the period of time involved; and that such, containing 5% pure Rotenone, were selling in that market for prices of 35¢ and 36¢ per pound, with some sales at slightly higher rates, namely, up to 38¢ per pound, and some were as high as 42¢ per pound. The figure of 35¢ is adopted by the court because the consensus of the testimony so indicates.

The plaintiff is not satisfied that his damages should be computed on that basis, however, because it appears that the supply of this product was so limited, beginning as early as October, 1941, that the said quotations cannot be relied upon as establishing the market price, since supplies were so closely held that each dealer confined his distribution to his old customers, and that the plaintiff did not come within that category as to any of the dealers other than the defendants in this action.

The plaintiff relies on a transaction of February 7, 1942, wherein the firm of Dodge Olcott & Company made what was called a deal with the plaintiff, whereby the former sold 6 tons of 5% Rotenone-bearing material to the plaintiff at 32¢ a pound, in consideration of the plaintiff's agreeing to cancel 40% of a 5,000 pound contract which he had with that concern for resins at $2.50 per pound, which were then selling in New York City at from $3.25 to $4.50 per pound, as the result of which the plaintiff is deemed to have suffered a loss in book value of the difference between the price which he agreed to pay, of $2.50 per pound, and the current quotations which may be roughly taken at $3.50 per pound, or about $2,000.

It is urged that this is a special circumstance within the contemplation of paragraph 3 of section 148 of the Statute which has been quoted, and should enter into the computation of the plaintiff's damages.

■ It is impossible to agree with this contention, because the evidence, in the view presently held, would not so justify. What the plaintiff sacrificed, in his release of the resins contract as to 2,000 of the 5,000 pounds, was a potentiality at best, because there is no proof that he requisitioned the 5,000 pounds and could have procured delivery on the date in question; nor is there any proof as to what the market price was when he actually took the balance of 3,000 pounds, if he ever did; moreover, a concession of 3¢ a pound on the 5% of Rotenone content of the Timbo powder was part of the larger transaction, even though it enabled the plaintiff to receive only 60% of what he contracted for from the defendants. There is no proof that by making similar "deals" he could not have obtained another 4,000 pounds at the same or some other price concession. In other

words, that transaction must be regarded as a thing apart, so far as the establishment of the plaintiff's damages is concerned, and the defendants are not to be held except as the Statute says, for "loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract".

 The ordinary and natural result of the defendants' breach of contract was the additional cost to the plaintiff of procuring the subject-matter of the contract, and the proof is not deemed to be sufficient to establish that he could not have purchased 10 tons of the desired commodity at about the market price of 35¢ a pound. For this reason, the plaintiff's recovery is limited as stated, and the plaintiff may have judgment against the defendants for the amount stated in the foregoing conclusion; namely, $2,860.50, with interest from February 1, 1942.