### PARROTT v. ALLISON et al.
#### No. 16.

Circuit Court of Appeals, Second Circuit.

Nov. 3, 1944.

George L. Madden, of New York City, for appellant.

William H. Wurts, of New York City (Arthur W. Rinke, of New York City, on the brief), for appellees.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In this action plaintiff seeks damages for defendants' failure to deliver, pursuant to contract, ten tons of powdered timbo root. Plaintiff compounds insecticides for agricultural uses with rotenone as an essential ingredient. Rotenone is obtained from roots, of which the Far Eastern product is called Derris powder, while the South American product is called Timbo or Cube powder. Defendants are engaged in importing these powders from foreign countries, and at the trial below made the defense that their contract with plaintiff was conditioned upon their receipt of the product in question from their South American exporter. The District Court, however, in a careful analysis of the testimony, held for plaintiff and fixed the date of breach as February 1, 1942. It then made a finding, "The market or current price of Timbo powder in New York during February of 1942 was 35¢ per pound" [48 F.Supp. 955, 958]; and since the contract price as finally settled was 19¢ per pound, it computed the damages at the difference of 16¢ per pound, less certain customs and other charges which plaintiff had agreed to pay and which were settled as $339.50. 48 F.Supp. at page 958. The defendants have not appealed, but plaintiff appeals on the ground that the damages awarded were insufficient. He asserts that there was no available market to fix a market price for the product, and that he was, therefore, entitled under N.Y. Personal Property Law, Consol. Laws, c. 41, § 148, subd. 2, to "the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract," or alternatively to damages because of special circumstances, under subd. 3, which allows the difference between the contract price and the market or current price where there is an available market for the goods in question "in the absence of special circumstances showing proximate damages of a greater amount." Hence the sole question here is the application of the statute—which is § 67 of the Uniform Sales Act—to the present facts.

While the court found the market or current price of the product as stated, nevertheless in its explanation of its holding on damages it accepted plaintiff's version of the situation, to wit, "it appears that the supply of this product was so limited, beginning as early as October, 1941, that the said quotations cannot be relied upon as establishing the market price, since supplies were so closely held that each dealer confined his distribution to his old customers, and that the plaintiff did not come within that category as to any of the dealers other than the defendants in this action." 48 F.Supp. at page 958. The record, moreover, leaves no doubt as to this conclusion, for plaintiff himself testified that he went to all the dealers in the New York market and was unable to make any purchase after the breach, except for a single somewhat involved transaction hereinafter more particularly discussed. And this testimony is further borne out by two stipulations—one, somewhat ambiguous, made in the trial court, the other, somewhat clearer, made before us—which indicate that plaintiff did approach certain specified dealers without success. Nor does a further stipulation that there took place certain "spot sales," beginning in October, 1941, with 35¢ per pound being the price charged during February, 1942, suggest the contrary, for there is nothing in the term "spot sales," i.e., sales for immediate delivery, which would necessarily contradict the testimony that only old customers could buy.

The one transaction whereby plaintiff was able to obtain some of the product after defendants had failed to supply it occurred on February 7, 1942, when plaintiff made a "deal" with another firm, whereby the latter sold him 6 tons (12,000 pounds) of rotenone-bearing material at 32¢ per pound, in consideration for his cancellation of 40 per cent of a contract he had with that firm for the purchase of 5,000 pounds of resins at the price of $2.50 per pound. Since resins were then selling in New York City at a price ranging from $3.25 to $4.50 per pound, plaintiff thereby relinquished profits equalling the difference between the agreed and the current price of the resins. The court stated that the market price of the resins "may be roughly taken at $3.50 per pound," and hence that the total loss would be about $2,000. Nevertheless, in its ultimate decision it declined to find this as a "special circumstance" for which damages should be awarded, on the grounds of lack of proof that plaintiff had actually called for delivery of the resins and could have procured delivery on the date in question, as well as of their actual market value

when he took delivery of the balance, if he ever did. The court further held, "moreover, a concession of 3¢ a pound on the 5% of Rotenone content of the Timbo powder was part of the larger transaction, even though it enabled the plaintiff to receive only 60% of what he contracted for from the defendants. There is no proof that by making similar 'deals' he could not have obtained another 4,000 pounds at the same or some other price concession." 48 F. Supp. at page 958.

Plaintiff attacks this conclusion of the court and urges use of this transaction as a basis for ascertaining a net purchase price of rotenone-bearing material to him of 48.6¢ per pound, found by dividing $2,000 by 12,000 pounds and adding the result to the purchase price of 32¢ per pound. This figure plaintiff would then use to show a loss of 29.6¢ per pound over the 19¢ contract price, or a gross loss for the 10 tons of $5,920, which, less the agreed charges of $339.50, would yield a total loss of $5,580.50.

It does appear that there is an ambiguity in the findings of the court in holding both that there was a market or current price for the product at the time of breach and that plaintiff could not buy generally in the market, which was restricted to old customers. Plaintiff was an old customer only of defendants, who refused to sell to him; and hence the judgment below does not actually recompense him for defendants' breach, as he could not buy rotenone-bearing material at 35¢ per pound. Under the circumstances, and having in mind the evidence above cited, we think the conclusion unjustified that there was a market price within the statutory meaning and as defined in cases such as Saxe v. Penokee Lumber Co., 159 N.Y. 371, 379, 54 N.E. 14, or Parsons v. Sutton, 66 N.Y. 92, and hence that plaintiff is entitled to seek recovery under the second subdivision of the statute. Farish Co. v. Madison Distributing Co., 2 Cir., 37 F.2d 455; Gilman v. Broad Brook Co., 137 Misc. 685, 243 N.Y.S. 312. The few sales at 35¢ per pound restricted to old customers do not show a general willingness of vendors to sell, cf. Becker v. Arnstaedt & Co., 207 App.Div. 633, 202 N.Y.S. 627; nor would an award based on such an essentially fictitious price give plaintiff the value of the product to him or a price at which, for example, he could have sold it. Neverfail Lighter Co. v. Blum, 201 App.Div. 153, 194 N.Y.S. 24. Indeed, as we understand the decision below, it is doubtful if the court meant to deny these principles or to go further than to hold the higher award claimed by plaintiff unproven on the evidence in this case.

We think, however, that this conclusion of lack of proof is unjustified, under the circumstances of this case, so far as concerns the loss suffered by plaintiff in canceling a part of his favorable contract for the purchase of resins, and hence in purchasing six tons of the Timbo powder. The only evidence wanting would seem proof that plaintiff had been ready, able, and willing to go through with the resin purchase; not only was this not challenged, but it seems to us that it became unnecessary when defendants stipulated that there was "$2,000 as a gross loss on the resins."[1] The suggestion that plaintiff might have recouped his loss further by similar transactions would really support plaintiff's contention that this measure of damages should apply to his entire purchase; but that seems to us unproven. While loss of expected profits is a normal measure of damages for articles not available in a market, Orester v. Dayton Rubber Mfg. Co., 228 N.Y. 134, 126 N.E. 510; Acunto v. Schmidt-Dauber Co., 207 App.Div. 411, 202 N.Y.S. 1, or where such profits are not shown, an appropriate measure may be the difference between the contract price and the cost to him of other goods, Masterton v. Brooklyn, 7 Hill, N.Y., 61, 42 Am.Dec. 38; Rhode Island Malleable Iron Works v. O. K. Nut Lock Co., R. I., 103 A. 1036; see Seward v. Pennsylvania Salt Mfg. Co., 266 Pa. 457, 109 A. 617, yet in each case the award must be reasonable and not merely speculative. For the six tons we hold, therefore, that the difference between the contract price and the cost to plaintiff of 29.6¢ per pound was adequately proven for a total of $3,552. As to the remaining four tons, plaintiff did not purchase them at this increased price, nor does he show direct profits that he could have obtained had they been delivered to him. But it is, of course, clear that he was damaged by the nondelivery of

---

[1] Defendants also figured "roughly $1,640 net loss," deducting $360 because the purchase price set on the rotenone material of 32¢ per pound was "three cents under the market." This deduction falls with our conclusion that there was no genuine market.

these four tons also; and under the circumstances to deny him any recovery as to them would be clearly inequitable and a violation of the rule that an approximate rule of damages may be taken in the absence of a more exact yardstick. Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 1013, certiorari denied 322 U.S. 747, 64 S.Ct. 1158; Baird v. Franklin, 2 Cir., 141 F.2d 238, 246, certiorari denied 65 S.Ct. 38; Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336. Here the fact that the product was purchased, wherever it could be found available, at 35¢ per pound certainly established that as the minimum value for which it could be sold, and justifies its acceptance as a basis of computation. Cf. Lehman, J., in B. P. Ducas Co. v. Bayer Co., Sup., 163 N.Y.S. 32, 40. Hence for the four tons the loss should be computed at 16¢ per pound, or $1,280. Subtracting the agreed amount of the charges of $339.50 from the total of the two sums leaves $4,492.50, which, with interest from February 1, 1942, and the costs here and below, is the proper award to be made to plaintiff. The judgment is, therefore, modified accordingly and, as so modified, is affirmed.