HARRY SEGALL, Plaintiff, *v.* GEORGE H. FINLAY and Others, Defendants.

Supreme Court, New York County, November 30, 1925.

Sales — execution of contract — action for anticipatory breach of contract for sale of sugar predicated on sellers' failure to deliver — contract became effective on plaintiff's compliance with condition required by defendants that its bank would wire it would open letter of credit in defendants' favor covering purchase — subsequent telegrams of defendants merely proposition to change contract — said contract unchanged by defendants' refusal to accept plaintiff's condition as to further banking arrangements — contemporaneous writings of great probative value when oral testimony is conflicting — cause of action accrued on date when defendants' repudiation of contract was accepted by plaintiff — damages — measure of damages under Personal Property Law, § 148, subd. 3, is difference between contract price and market price of goods at time when and place of delivery — contract reciting " cost and freight, New York April shipment from Cuba " should be construed under Personal Property Law, § 127, and not § 100, subd. 5 — contract required delivery of sugar on board vessel in Cuban port on or before April 30, 1923 — plaintiff entitled to difference between contract price and market price in Cuba on that date.

A contract for the sale of a consignment of Cuban sugar by defendants to plaintiff became effective and was not subject to any further conditions where, following an exchange of telephone and telegraphic messages as to the price and delivery, defendants telegraphed, in confirmation of a previous understanding between said parties, that upon plaintiff's receipt of defendants' sales contract, plaintiff would furnish defendants " with satisfactory, confirmed, irrevocable letter of credit " which plaintiff's bank would wire it would provide and that, prior to the filing by defendants of a telegram that they could not accept a letter of credit from plaintiff's bank, defendants received said bank's telegram that a letter of credit had been opened in defendants' favor to cover the purchase under the contract. When plaintiff directed its bank to telegraph defendants relative to the credit letter, plaintiff had performed the only condition precedent, the contract became binding on both parties, and plaintiff is entitled to judgment in an action for an anticipatory breach of the contract arising from the refusal of the defendants to deliver the sugar.

Telegrams of the defendants sent subsequent to the receipt of the telegram from plaintiff's bank as to the letter of credit and too late to permit of action by plaintiff before the time fixed by defendants to the effect that defendants could not accept plaintiff's bank as a guaranteeing agent, and that they must have other " satisfactory financial arrangements completed and approved " before five P. M. of the day the contract was executed, was a proposition for a change in the contract and was ineffectual where plaintiff accepted on condition that it be given until the following day to make the banking arrangements which defendants refused to accept, thus leaving the contract unchanged.

Contemporaneous writings have great probative value where there is a conflict in the oral testimony, especially when the writings are intended to confirm the oral conversations.

40

Plaintiff's cause of action accrued on the date when defendants' repudiation of the contract was accepted by the plaintiff and not on the date when defendants repudiated the contract.

The proper measure of damages under subdivision 3 of section 148 of the Personal Property Law is the difference between the contract price and the market or current price of the goods at the time when and the place where they should have been delivered.

The contract, the final terms of which recited " at five and one-eighth cents cost and freight, New York April shipment from Cuba," is within the provisions of section 127 of the Personal Property Law rather than subdivision 5 of section 100, and required the delivery of the sugar on board a vessel in a Cuban port on or before April 30, 1923; the measure of damages to which plaintiff is entitled is the difference between the contract price and the market price in Cuba on April 30, 1923.

Action is to recover damages for a breach of an alleged contract for the sale of 4,000 tons of Cuban sugar by the defendant to the plaintiff, by the refusal of the defendant to deliver.

*Gleason, McLanahan, Merritt & Ingraham,* for the plaintiff.

*Wickes & Neilson* [*Nathan F. George* of counsel], for the defendants.

Page, Referee. The negotiations for the sale of sugar by the defendants to the plaintiff were carried on by means of telephone conversations, which were confirmed by the defendants either by telegrams or letters. The parties have stipulated the receipt and contents of these telegrams. The principal questions of fact arise from statements alleged to have been made over the telephone. The parties had on February 19, 1923, entered into a contract for the sale of 3,000 tons of sugar, payment for which was guaranteed by the State Commercial and Savings Bank under the provisions of the contract, " buyers to furnish approved banker's guaranty of their performance of contract immediately." . This 3,000 tons of sugar was delivered direct to the National Sugar Refining Com-pany for account of the plaintiff, and payment made by that company for plaintiff's account. The transfer of this contract to the National Sugar Refining Company was prior to February 27, 1923. On February 27, 1923, the plaintiff telephoned to the defendants and made a bid of five and one-eighth cents a pound, cost and freight New York, for 8,000 tons of Cuban sugar April shipment from Cuba. The defendants on the same day, wrote a letter to plaintiff, with the sole purpose of making a record of the oral conversation, for this letter, in due course of the mail, could not be received by the plaintiff before ten o'clock the following morning, and was in fact received by plaintiff on March 1, 1923. The letter read as follows: " We beg to confirm telephone conversation with you to-day and thank you for your bid of $5\frac{1}{8}$¢ C. & F. New York for

8,000 tons of Cuban centrifugal sugar, April shipment from Cuba, subject to reply leaving us not later than 10 A. M. to-morrow morning. Same terms as last."

On February 28, 1923, prior to ten A. M., defendants signed and sent to the plaintiff a telegram, which plaintiff received about eleven A. M. on the same day, as follows: " Accept bid four thousand tons Cuban centrifugal basis ninety-six five and one-eighth cents cost and freight New York April shipment from Cuba terms and conditions as customary subject satisfactory bank guaranteeing or confirmed credit by wire to-day."

After the receipt of this telegram the plaintiff called the defendants on the telephone, and had a conversation with Mr. Jager, the employee of the defendants who was acting in its behalf in this transaction. The plaintiff's testimony in regard to this conversation is that he called up to inquire about the other 4,000 tons for which he had bid. In this conversation Jager said, referring to the accepted bid: " What about the bank on this 4,000 tons? " Plaintiff replied: " Well, it will be the State Commercial and Savings Bank." Jager said: " Could you give us any other bank? " Plaintiff replied: " We were doing business almost exclusively through the State Commercial and Savings Bank, and that would be the bank that we would give them." Jager said: " Well, we have already got a guaranty from that bank for 3,000 tons of sugar and we would like some other bank." Plaintiff said: " We could not give you any other bank." Jager said: " Then would you do this, instead of the guaranty this time, would the State Commercial and Savings Bank give us a letter of credit? " Plaintiff replied: " Yes, sir; they would." Jager then said: "All right, then you have your bank wire us that they will put up this letter of credit." Plaintiff replied: " You understand the bank won't take out this letter of credit until you have your formal sales contract before them, so that the letter of credit will conform to the sales contract." Jager said: " That is all right." Plaintiff then said: " You mail your contract, and the State Commercial and Savings Bank will put up the letter of credit." Jager said: "All right; but in the meantime have your bank wire us immediately that they will do so." Plaintiff said: "All right, and you confirm the conversation." And Jager said: "All right."

Jager's testimony was that, when he received the bid on February 27, 1923, he asked plaintiff whether his bid was subject to a satisfactory bank letter of credit or satisfactory bank guaranty being furnished by a bank other than the State Commercial and Savings Bank, and plaintiff told him he would do that; there would be no difficulty about it. He further testified: "At about prior to 10

o'clock February 28, 1923, Finlay & Co. accepted Butler, Ward & Co.'s bid for 4,000 tons sugar, subject to a satisfactory irrevocable letter of credit being received the same day. Butler-Ward then called up and said that the bank did not know how to make up the details of the letter of credit until they received our contract, but that in the meantime they would wire that such a letter of credit would be provided. Again I asked Mr. Segall if a bank other than the State Commercial and Savings Bank would wire to guarantee that letter of credit would be provided when our contract reached Chicago, and he said, ' Yes, it would; some other bank.' "

When there is a conflict in the oral testimony, and there is in evidence contemporaneous writings, the latter have great probative value, and especially when they were intended by the parties to be confirmation of the oral conversations. In the letter written by the defendants on February 27, 1923, confirming the telephone conversation, there was no mention whatever that the bid was subject to a satisfactory bank letter of credit or a satisfactory bank guaranty being furnished by some bank other than the State Commercial and Savings Bank. On the contrary, it did state, " Same terms as last," which referred to the contract of February nineteenth, which, as we have stated, required the plaintiff to furnish " approved banker's guaranty," for which the guaranty of the State Commercial and Savings Bank was accepted by the defendant. If so important a condition was to be imposed upon the bid, the defendants would have embodied it in the letter of confirmation. Mr. Jager was also mistaken that the conversation with reference to the bank issuing a confirmed letter of credit instead of a bank guaranty occurred before the telegram which defendants sent prior to ten A. M. on February twenty-eighth, for that telegram read: " Subject satisfactory *bank guaranteeing* or confirmed credit by wire to-day." Therefore, I shall accept the plaintiff's version that the conversation in regard to the issuing of a confirmed letter of credit upon the receipt of the contract was after, and not before, the telegram accepting the bid for 4,000 tons. The defendants sent a telegram confirming the final understanding of the parties on February 28, 1923, at about twelve-thirty P. M., which was received by the plaintiff at about one-forty-five P. M., as follows: " Confirming understanding that upon receipt our sales contract to you for four thousand tons Cuban centrifugal sugar basis ninety-six degrees at five and one-eighth cents cost and freight New York April shipment from Cuba on usual terms and conditions you will furnish us with satisfactory confirmed irrevocable letter of credit, in meantime your bank to wire us today that they will provide letter of credit therefore " (*sic*).

This written confirmation of the understanding, written by the defendants, is in exact accordance with the plaintiff's version of the oral agreement, and contrary to Jager's version of it, and became the final contract of the parties. In accordance with this contract the State Commercial and Savings Bank at about noon on February twenty-eighth signed and sent to defendants a telegram, which defendants received prior to two-thirty P. M., as follows: " Letter of credit for Butler, Ward & Company will be opened in your favor covering their purchase from you of four thousand tons Cuban centrifugal sugar per your wire as soon as contract received from you. Understand same already mailed. Confirming."

Plaintiff, at about the same time, sent a telegram to the defendants, which, so far as material, read as follows: " Confirming telephone conversation our bank just wired you letter of credit would be opened on receipt of contract rush same."

These two telegrams were received by the defendants before two-thirty P. M., when the defendants sent a telegram to the plaintiff, which he received at about two-fifty P. M. on the same day, which read as follows: " Cannot accept State Commercial and Savings Bank letter of credit for four thousand tons their responsibility insufficient must have other satisfactory financial arrangements completed and approved banks telegraphic confirmation before five P. M. to-day New York time otherwise cannot confirm sale four thousand tons."

At about three-twenty P. M. plaintiff sent to defendants a telegram which was received at about five-thirty-eight P. M. on the same day, as follows: " Letter credit will be issued by one of largest banks here or New York. Probably National City. All arrangements made. Awaiting contracts. You will be advised by bank to-morrow."

At five o'clock P. M. on the same date the plaintiff called up the defendants on the telephone, and said in substance what he had stated in the telegram, and said, " Give me until to-morrow morning and we will take care of it," and Jager stated it was too late in the day then to furnish any letter of credit; business had closed and their terms had not been complied with. At five-fifteen P. M. the defendants signed and sent to plaintiff a telegram, which plaintiff received at about nine A. M. on March 1, 1923, as follows: " Five fifteen P. M. as you have not furnished satisfactory banker's confirmed credit or guarantee regret we cannot accept your bid five and one-eighth cents cost and freight four thousand tons Cuban sugar."

On receipt of this telegram the plaintiff sent a telegram to defendants as follows: " Your wire to-day you have accepted our bid and agreed to deliver four thousand tons Cuban sugar stop  We have

furnished satisfactory banker's confirmed credit stop We cannot release you stop Must have sugar stop Wire then contract mailed."

The State Commercial and Savings Bank wrote to the defendants, confirming its telegram of February twenty-eighth. On March 2, 1923, the defendants telegraphed to the plaintiff as follows: " Your wire March first stop Your bid only accepted subject to wire from bank approved by us that it would open irrevocable letter of credit stop We wired disapproval of State Commercial & Savings Bank and that we required receipt of approved banks telegraphic confirmation before five P. M. February twenty-eighth stop No approved banks confirmation Recd stop We therefore have no contract with you for four thousand tons."

There then followed telegrams and letters between the attorneys for the respective parties. To substantiate Mr. Jager's testimony that on February 27, 1923, he had told plaintiff over the telephone that some bank other than the State Commercial and Savings Bank must be offered as guarantor or opener of the letter of credit the deposition of Francis Drake, one of the defendants, was read. He testified that he stood alongside of Jager, when, as Jager told him, he was talking to plaintiff, and heard Jager say that " We want other guaranties than that of the State Commercial Bank of Chicago; the State Commercial Bank of Chicago was already committed to us for a previous transaction and we wished to have in the case of further business a credit or a guaranty by some other approved first-class bank satisfactory to us."

In my opinion, Mr. Drake, who says he also heard Jager speak to plaintiff on the twenty-eighth, has confused the two. He says that the conversation was about a bid for 4,000 tons of Cuban sugar, which was true of the conversation of the twenty-eighth, but not of the twenty-seventh, which related to a bid for 8,000 tons. It was also conceded that on the twenty-eighth Jager had telephoned to plaintiff that they had already a guaranty from the State Commercial and Savings Bank, and would like some other bank; and as plaintiff testified, and the confirming telegram shows, it was arranged that, instead of giving a bank guaranty, the plaintiff would furnish the defendants with satisfactory confirmed irrevocable letter of credit, which the State Commercial and Savings Bank of Chicago was to wire that day that they would provide. While Mr. Drake stated the requirement of Jager for some other bank, in much stronger language than Jager himself had claimed, which might be expected from an interested witness, the substance of his testimony would be clearly referable to the twenty-eighth, as confirmed by the defendants' telegram, and could not refer to the

conversation of the twenty-seventh as confirmed by defendants' letter. Mr. Jager also testified that within three or four days after the receipt of the letter from the State Commercial and Savings Bank guaranteeing the performance of the contract of February 19, 1923, he had an interview with Mr. Forgan, one of the vice-presidents of the National City Bank, concerning the State Commercial and Savings Bank of Chicago, and Mr. Forgan was positive that this interview was a few days prior to February 28, 1923.

There are, however, facts in the testimony that fix the date with definiteness. It was established that there were no transactions between the parties hereto between the contracts of February nineteenth and the one in suit. Mr. Forgan testified that Mr. Jager told him that the defendant had an offer of credit of the State Commercial and Savings Bank on the sale of sugar, and told him they already had a credit with them for an " amount which he could not remember." He testified: " The two were going to overlap, the total of the two credits and I said — the thing is coming back to me better now — I said: ' If you had come to me in the first instance, you would not have taken the first credit.' "

And again he testified: " They accepted the first contract without coming to me, and when they came to me they said, ' We already have a credit with them for about so and so much,' and I said, ' You have too much now.' Q. In other words, they came to you about a prospective credit? A. If they were to accept the credit of the State Commercial and Savings Bank, they could sell the sugar to Butler-Ward. My understanding was, if it was not a satisfactory bank credit, the deal would not go through."

This testimony fixes the time of the conversation between Jager and Forgan on February 28, 1923, after the telephone conversation between Jager and plaintiff, which took place about noon. Mr. Forgan could very easily, after more than two years have elapsed, been mistaken in the date. The interview could not have been held, however, prior to the time when the plaintiff had offered, instead of a guaranty, a confirmed credit by the State Commercial and Savings Bank.

It is to be borne in mind that the two telegrams that confirm the oral agreement of the parties were written by the defendants, and must be held to express all the terms and conditions of the contract between the parties, and if any such important condition as that the bank which had guaranteed the first contract between the parties was not to be accepted either as guarantor or to furnish the letter of credit under the second contract, some mention would have been made of it. The explanation given by Mr. Jager for its omis-

sion is not convincing, for it would not have been necessary to name the bank, but merely to provide a bank other than the guarantor of the last contract. The omission of any mention of this condition is strong proof that no such condition was mentioned in the oral conversations.

I shall find, therefore, that the defendants agreed to sell to the plaintiff, and the plaintiff agreed to buy, 4,000 tons of Cuban centrifugal sugar, basis ninety-six degrees, at five and one-eighth cents cost and freight New York, April shipment from Cuba on the usual terms and conditions, and that on receipt of the defendants' sale contract the plaintiff agreed to furnish the defendants with satisfactory confirmed letter of credit, and that the plaintiff's bank was to wire on February 28, 1923, that it would provide letter of credit. When the plaintiff complied with the condition, and the State Commercial and Savings Bank of Chicago telegraphed at about noon of that day that "letter of credit for Butler, Ward & Co. will be opened in your favor covering their purchase from you of four thousand tons Cuban centrifugal sugar per your wire as soon as contract received from you," the plaintiff had performed the only condition precedent, and the contract became binding upon both parties.

The subsequent telegram of the defendants that they could not accept the State Commercial and Savings Bank, and that they must have other satisfactory "financial arrangements completed and approved before five P. M. to-day New York time," was a proposition for a change in the contract, to which the plaintiff was willing to agree, if given until the next day to make the banking arrangements. The telegram was sent too late to allow the plaintiff to make the required banking arrangements before the time set by the defendants. The proposition was accepted only conditionally, and the defendants declined to accede to the condition, and the contract remained unchanged.

The defendants, by refusing to send on the formal sales contract, prevented the issuance of the letter of credit, and on February 28, 1923, at five-fifteen P. M. repudiated the contract. On March 2, 1923, the plaintiff's Chicago counsel telegraphed to defendants: "Butler, Ward & Co. have consulted us as their counsel with reference to your refusal to carry out your agreement for sale four thousand tons Cuban sugar stop Have investigated the facts and advised clients that you are bound to deliver sugar as per your agreement and will hold you responsible for loss and damage in the event you do not deliver stop Clients advise formal contract not received stop Clients must have sugar stop Please wire us our expense Rockers Chicago what you propose to do."

The same day defendants' attorneys telegraphed, reiterating the defendants' contention that no contract was made, due to plaintiff's failure to meet defendants' conditions. On March 9, 1923, plaintiff's attorneys sent a letter, which was received by the defendants the same day, as follows: " Butler, Ward & Co. has consulted us with reference to the contract made on or about February 28, 1923, by which you agreed to sell to it 4,000 tons of Cuban sugar. We note from the documents that you have taken the position that no contract was consummated. In order that there may be no misunderstanding, we wish to accord you every reasonable opportunity to retract from your unjustifiable position. Our client, therefore, instructs us to advise you, unless we hear from you to the contrary on or before March 12, 1923, it will assume that you intend to persist in your refusal to perform the contract, and that it will accept your repudiation as final, and will hold you responsible for all losses and damages which it suffers by reason thereof."

On March 12, 1923, the defendants' attorneys wrote to plaintiff's attorneys that the defendants had never receded from their original position that there was no contract between the parties, and that they would not recede from their position. Therefore, on March 12, 1923, the plaintiff accepted the repudiation of the contract, and a cause of action for an anticipatory breach accrued to the plaintiff.

The parties have stipulated the amount of damages on various dates, if it should be found that the defendants were liable in damages. The defendants claim that, if a contract was made, the damages are fixed by the market of February 28, 1923, the date of defendants' repudiation, defendants' argument being that the measure of damages for an anticipatory breach of a contract for the future delivery of merchandise of a nature generally dealt in for future deliveries, and of contracts for future delivery of which there is a present market, is the difference between the contract price and the market price of a new contract for such future delivery not, on the one hand, the date of breach of a contract for present delivery, nor, on the other hand, the market price at the actual date delivery should have been made under the contract.

Even if, on the breach of the contract, the plaintiff would have been required to make a forward contract for the sugar, the date of the breach would not be February 28, 1923, but March 12, 1923, when the defendants' offer of repudiation was accepted by the plaintiff. Until that time the contract was kept alive by the plaintiff, who was demanding performance, and the defendants could have forwarded the formal sale contract and required a satisfactory letter of credit from the plaintiff's bank, and proceeded to make

deliveries on the due date pursuant to the contract. When, however, the plaintiff placed a limit on the time for defendants to withdraw their refusal to perform the contract, upon failure to do which the plaintiff notified the defendants that he would hold their repudiation as final and hold them responsible for damages, the cause of action accrued on the date so fixed.

It has been held in England that, after a repudiation has been accepted as a breach, the injured party should at once make another contract with a third person like that which has been repudiated, if the market prices are clearly tending in a direction making that the more profitable course for the defendants. This rule has not, however, so far as I have been able to ascertain, been adopted in this State, and the reasons against its correctness are thus clearly stated by Professor Williston (Williston Sales [2d ed.], § 588): " In the first place it is always impossible to be certain whether the prices are going up or down. To speak of a market ' obviously falling ' or ' obviously rising ' is to speak without due reflection. The prices at which persons will make contracts for future delivery must always be based on the estimate of well-informed persons as to the future value of the goods in question. Many things are obvious after the event which were not so previously. At least it is never so clear what turn the market price of a commodity may take that it is entirely certain that if the plaintiff at once makes a substituted contract it will turn out to be profitable to the defendant. It is not clear then to take such a course will mitigate damage, and though for his own protection it may often be reasonable for a party to take this course, * * * there seems to be no reason why he should adopt this course for the defendant's benefit. Another reason against the English decisions is that the plaintiff is entitled to use such money or credit as he has for making all the forward contracts he is able to for his own benefit."

It might be added as an additional objection to the English decision that, if the plaintiff should make a forward contract, whereby his loss would have been increased, he could not recover such increased loss from the defendants. (*Guaranty Trust Co. of New York* v. *Meer*, 114 Misc. 327, 331.) The rule of damages in a case of this kind is laid down in section 148, subdivision 3, of the Personal Property Law (as added by Laws of 1911, chap. 571) and under the decisions is to be applied where there is an available market for the goods in question; *i. e.*, the difference between the contract price and the market price or current price of the goods at the time when and the place where they should have been delivered. (*Saxe* v. *Penokee Lumber Co.*, 159 N. Y. 371; *Todd* v. *Gamble*, 148 id. 382; *Windmuller* v. *Pope*, 107 id. 674; *Orester* v.

*Dayton Rubber Mfg. Co.,* 228 id. 134, 136; *Seaver* v. *Lindsay Light Co.,* 233 id. 273; *Standard Casing Co.* v. *California Casing Co.,* Id. 413, 418.) This rule applies whether the breach of the contract is caused by a failure to deliver on the due date, or by an anticipatory breach caused by an accepted repudiation in advance of the due date. (Sedg. Dam. [9th ed.] § 636-d.) The effect of an anticipatory breach is not to advance the time for the assessment of damage to the date of the breach, nor does it require the plaintiff to buy other goods, nor to gamble on the market for the benefit of the defaulting defendant, by making forward contracts with other parties. (*Goldfarb* v. *Campe Corporation,* 99 Misc. 475, 481; *Second Nat. Bank of Hoboken* v. *Columbia Trust Co.,* (C. C. A.) 288 Fed. 17.)

In the instant case it is stipulated that there was an available market for the goods in question in the city of New York and in Cuba, and that the prices were the same in both places on the various dates therein stated.

An interesting question arises under this contract, whether the place of delivery was New York or a Cuban port. If the latter, the seller would have until the last day of April in which to make the shipment, and the damage would be the difference between the contract price and the market price on April 30, 1923. If the former, the date upon which the damage should be computed would be the day on which a shipment made from Cuba on April 30, 1923, by the usual means of transportation, would have arrived in New York city. (*Schopflocher* v. *Zimmerman,* 240 N. Y. 507.) I, therefore, requested the parties to stipulate as to the time that such a shipment would arrive in New York, and the damages that would then accrue, and also to submit briefs on the construction of the contract in this regard, in order that there might be in the record an agreement on the facts in both aspects of the case.

In the telegram of February 28, 1923, which stated the final terms of the contract between the parties was the following phrase: "At five and one-eighth cents cost and freight New York April shipment from Cuba."

This is not the usual c. i. f. contract, and the omission of the word " insurance " would seem to indicate that the seller was to retain title to the goods, and the risk of the voyage against which insurance would be taken was upon the seller, and not upon the buyer.

There is no authority in this State, and so far as I have been able to discover in any other jurisdiction, defining a cost and freight contract. In Williston on Sales (2d ed. p. 621) it is said: " ' C. and F.' a named port, indicates that the price quoted or agreed upon

includes cost and freight to the named port. It is not so clear under such a contract as under c. i. f. contracts that the risk during transit is upon the buyer, since the provision for insurance in the latter case is a clear indication of intention. It may fairly be argued that where there is no provision for insurance by the seller the case falls within the provision of the Sales Act, which defers the transfer of ownership to the buyer until the arrival of the goods, where the seller pays the freight. Nevertheless it is probable that under a c. and f. price the mercantile understanding is that the seller fulfills his duty on shipment of the goods and that the risk thereafter is upon the buyer, unless other terms of the contract indicate a contrary intention."

On page 624 Williston states that certain definitions of export quotations have been adopted by various trade associations therein named, which, from the character and standing of the associations participating in the conference at which these definitions were adopted, it would appear that they fairly state the understanding of these terms among merchants, which should be the guide for the courts in the interpretation of such contracts, unless a contrary construction is clearly provided by law. In this it is stated:

" 9. The seller may be ready to go farther than the delivery of his goods upon the overseas vessel and be willing to pay transportation to a foreign point of delivery. In this case, the proper term is: ' C. & F. (named foreign port) ': Under this quotation:

" A. Seller must (1) make freight contract and pay transportation charges sufficient to carry goods to agreed destination; (2) deliver to buyer or his agent clean bills of lading to the agreed destination; (3) be responsible for loss and/or damage until goods have been delivered alongside the ship and clean ocean bill of lading obtained (seller is not responsible for delivery of goods at destination).

" B. Buyer must (1) be responsible for loss and/or damage thereafter and must take out all necessary insurance; (2) handle all subsequent movement of the goods; (3) take delivery and pay costs of discharge, lighterage and landing at foreign port of destination in accordance with bill of lading clauses; (4) pay foreign customs duties and wharfage charges, if any."

The fact that the freight to New York is to be added to the cost, and hence ultimately paid by the buyer, would seem to bring the contract within the provision of section 127 of the Personal Property Law, rather than section 100, subdivision 5 (both sections added by Laws of 1911, chap. 571). I shall, therefore, hold that the contract provided for delivery of the sugar on board a vessel in a Cuban port on or before April 30, 1923, and that the damage to the plaintiff is the difference between the contract price and the

market price in Cuba on April 30, 1923, which the parties have stipulated amounted to $106,400.

The defendants' counterclaim requires very little consideration. The stipulated facts are as follows: On March 5, 1923, plaintiff sent to Minford, Lueder & Co., New York, a night letter which Minford, Lueder & Co. received at the opening of business on March 6, 1923, as follows: " Offering five thousand tons Cuba centrifugals March and April shipment from Cuba at five one quarter cents cost and freight New York if interested wire immediately."

On March 6, 1923, at eleven-thirty A. M., Minford, Lueder & Co. sent the plaintiff a telegram, which plaintiff received before twelve-fifty P. M. that day, as follows: " Refer your offer five thousand tons accept for account of G. H. Finlay & Co. three thousand tons five one quarter cost and freight New York to apply against your purchase from them wire confirmation immediately."

On March 6, 1923, at twelve-fifty-one P. M., plaintiff sent the following telegram to Minford, Lueder & Co., which they received at about two-fifteen that day: " Regret cannot confirm sugars we offered sold."

Clearly there was no contract of sale established. The offer was for 5,000 tons to Minford, Lueder & Co. They made a counter offer to purchase 3,000 tons for the defendants to apply against the contract of February 19, 1923, between plaintiff and defendants. This offer the plaintiff declined. In order to recover, the defendants had to establish a contract with them which was broken by the plaintiff. The defendants argue, because a reason for declining was given, that the sugar for which a firm offer had been made was sold, that established a willingness to sell 3,000 tons to the defendants. This contention cannot be sustained. The reason given for declining an offer is of no great moment. The fact is that there was no meeting of the minds, and no contract entered into even with Minford, Lueder & Co. The counterclaim should, therefore, be dismissed.

Plaintiff is, therefore, entitled to judgment against the defendants for the sum of $106,400, with interest from April 30, 1923, with costs.