MADEIRENSE DO BRASIL S/A v. STUL-
MAN–EMRICK LUMBER CO.

No. 108.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1945.

FRANK, Circuit Judge, dissenting.

———◇———

Carl E. Ring, of New York City (Ring & Murray, of New York City, on the brief), for appellant.

Irving Moldauer, of New York City, for appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is an action, brought in the District Court because of the diverse citizenship of the parties, wherein Madeirense do Brasil S/A, a Brazilian corporation, sues to recover the balance due on a shipment of lumber to the defendant, Stulman-Emrick Lumber Co., in New York. In its complaint plaintiff set forth the contract and shipment on which it based its claim, and also explained that a later contract had been cancelled by defendant. It claimed a balance due on the purchase price of $1,078.98 and a refund of "excess freight" charges of $2,490, with interest and costs. In its answer defendant pleaded at length facts hereinafter discussed, to show that it was entitled to deduct from the purchase price the excess freight charges paid by it, and also, by way of counterclaim, asked for

damages for breach of the second contract. The case was heard below on cross motions for summary judgment, which placed in issue the meaning of the contracts as to delivery and payment of freight, and particularly whether plaintiff had performed the second contract by tendering delivery to a carrier in Brazil, or in the alternative was excused by a shortage of available ships. The court resolved the issues in defendant's favor and found that defendant should recover damages on its counterclaim of $5,282.50, against which should be offset the balance of $1,078.98, making a total of $4,203.52, with interest from January 31, 1941, and costs. Plaintiff has appealed.

Defendant buys and sells lumber and operates a lumber yard in Brooklyn. Originally there was a second defendant, Brazilian Minerals & Timbers Corporation, a New York lumber broker, who effected the contracts; but plaintiff has dismissed the action against it. Some dispute developed below as to whether Brazilian was plaintiff's or defendant's agent, and hence whether the orders from defendant to Brazilian, rather than those from Brazilian to plaintiff, constituted the real contracts. But, as we shall point out, the differences between these forms were not important enough to change the result, and it is not necessary to determine this question of agency.

The affidavits below brought before the court the extensive communications between Brazilian and each of the parties hereto. It therefore appears by Brazilian's confirmation order to plaintiff of October 15, 1940, that there were sold to defendant 140,000' of Brazilian pine lumber, kiln dried, and 310,000' (later increased to 360,000') of naturally dried lumber, at a price of $40 for the former and $38 for the latter "per 1,000 feet c & f New York," for "immediate shipment up to the 31st day of October at the latest," with inspection "upon arrival of the steamer in New York" and terms of "Letter of credit for 90% of the f.o.b. value, and the balance of 10% after arrival of the shipment in New York, the freight charges of $12.00 per 1000' to be paid in New York for your account." Plaintiff then had trouble in obtaining a ship, the Lamport & Holt line, by which plaintiff had intended to ship, being required by the English government to carry cotton to Canada. Eventually plaintiff was able to make arrangements for a ship from the Lloyd Brasileiro line, subject to the

condition that the minimum shipment would be 1,000 tons or 710,000'; and plaintiff, beginning November 22, 1940, urged Brazilian to have its customer increase its purchase to take the minimum. After some negotiations as to price, the second contract was entered into, as shown by Brazilian's confirmation order to plaintiff of December 5, 1940, which was of substantially the same tenor as the first contract, except that it was for 250,000' "naturally dried" lumber at "$40.00 per 1000' C. & F. New York," with "shipment up to December 31, 1940 at the latest" and with the terms changed to substitute $14 for $12 for the freight charges to be paid on arrival. And the contract called for "clean lumber, perfectly dried," free from knots or other defects. As the correspondence showed, the increase of $2 per 1,000' over the earlier contract was demanded by plaintiff because of the increase in shipping rates.

Plaintiff, however, still found difficulty in procuring shipping, and on January 8, 1941, cabled that Lloyd's would take only the lumber of the first contract below deck, while the other could be loaded only on deck at "buyer's responsibility" for "any deterioration." Brazilian immediately cabled that the pine "on deck" was absolutely unacceptable, and that only the lumber under deck should be shipped. This it reiterated by letter, demanding dried lumber and shipment by another steamer. On January 9, 1941, plaintiff wrote asking for cancellation of this order, since Lloyd's had now increased the freight rate to $33.13 per 1,000'. Brazilian cabled on January 22, 1941, that it was impossible to cancel the contract, as buyers demanded compliance, and asked plaintiff to "cable urgent date of shipment." There were further demands for shipment; but under date of January 23, 1941, plaintiff refused to ship unless the increase in the freight rate was "for account of the buyer," and suggested that claim be filed with the Brazilian embassy in Washington. On March 4, Brazilian wrote plaintiff that the first shipment was being unloaded that day, and again said that the buyers allege that they cannot excuse delivery of the 250,000' "under penalty of much more considerable losses." Plaintiff replied March 12, 1941, that "as we had already written you, this lot is definitely cancelled on account of force majeure, which compels us to do so against our will."

■ In this action plaintiff contends that it did not breach the contract relating to

the second lot of lumber, because defendant's refusal to allow shipment thereof on deck amounted to a cancellation of the contract. This contention is predicated in turn on its claim that it never became obligated to ship the lumber below deck. Defendant relies particularly on its order to Brazilian which definitely provided that "all lumber shipped by vessel must be stowed below deck," while plaintiff points to the absence of that provision in the order given it by Brazilian, and objects to the decision of the District Court holding it to this later order because Brazilian was its agent. But we think the same result follows from the contract plaintiff signed. Lumber shipped on deck would hardly meet the express requirements of this contract for lumber "naturally dried" and for "clean lumber, perfectly dried." If the matter were at all doubtful, it was made clear by plaintiff's obvious conclusion that it did not have the right, as shown by its cable of January 8, 1941, in effect asking for authority to ship above deck at buyer's responsibility for any deterioration and adding, "We do not know of another carrier."

■■ Plaintiff argues further that it has duly performed because a c. & f. contract requires it only to deliver, or to tender delivery of, the lumber to a carrier in Brazil. The term "c. & f." means that the price includes in a lump sum "cost" and "freight" to the named destination. Segall v. Finlay, 245 N.Y. 61, 156 N.E. 97, affirming 126 Misc. 625, 213 N.Y.S. 540; Id., 218 App. Div. 723, 218 N.Y.S. 895; The Hans Maersk, 2 Cir., 266 F. 806, 810, 811; Uniform Revised Sales Act, Proposed Final Draft No. 1, 1944, § 45, with comments by Professor Llewellyn, the Reporter, and his Advisers, pp. 177-179, citing and discussing the authorities. The term "c. & f." thus either requires the seller to prepay the freight or permits the buyer after having paid the actual charges to deduct them from the price, in either case putting the seller under an ultimate obligation to pay for the transportation. Ordinarily where the seller pays the freight, there is an inference under Rule 5 of § 19 of the Uniform Sales Act, N. Y. Personal Property Law, Consol.Laws, c. 41, § 100, rule 5, that the parties intend no passage of title until the goods reach the destination to which freight is paid. But commercial usage, recognized by the courts and text writers, is that under a c. & f. contract the seller fulfills his duty on shipment of the goods, and that the risk thereafter is on the buyer unless other terms of the contract indicate a contrary intention. Segall v. Finlay, supra; Twitchell-Champlin Co. v. Radovsky, 207 Mass. 72, 92 N.E. 1038; 1 Williston, Sales, 2d Ed., 621; Uniform Revised Sales Act, supra, § 45(2) (a), (3), (4), and comment p. 178. In Pittsburgh Provision & Packing Co. v. Cudahy Packing Co., 260 Pa. 135, 103 A. 548, 549, a case criticized in the comments to the proposed Uniform Revised Sales Act, "c. a. f." was erroneously translated as "cash and freight" and as "having apparently the same significance as f. o. b." destination. Unlike the latter, however, the general understanding is that the freight figures substantially only as a part of the purchase price, not as a reservation of title, and that the situation is similar to that of a c. i. f. contract, that is, one for "cost, insurance, and freight" to the designated destination.

■■ Indeed, here the necessary inference is the same as that for a c. i. f. contract, since the documents showed that insurance was to be effected by the buyer. Hence the risk during transit is upon the buyer, thus indicating an intention that title is to pass upon shipment and, as in the c. i. f. contracts, requiring delivery to a carrier only. Seaver v. Lindsay Light Co., 233 N.Y. 273, 135 N.E. 329; Cundhill v. A. W. Millhauser Corporation, 257 N.Y. 416, 178 N.E. 680; Jacob Glass, Inc. v. Banca Marmorosch Blank & Co., Soc. Anon., 122 Misc. 637, 204 N.Y.S. 636; Columbia Mills v. Machenbach Importing Co., 117 Misc. 283, 191 N.Y.S. 325; Uniform Revised Sales Act, supra, pp. 155-177. Moreover, the transaction by its terms was for 90 per cent of the f. o. b. value of the lumber at the mill in Brazil, with only the freight and balance of 10 per cent remaining to be paid after the arrival of the lumber in New York. Delivery of goods at destination thus is not made a condition precedent to the obligation of the buyer for the price, a contract provision which serves as further evidence of an intention on the part of the contracting parties not to obligate the seller beyond shipment. And this intention is not contradicted, as defendant contends, by the fact that under the agreement it is entitled to inspect the lumber upon arrival. Standard Casing Co. v. California Casing Co., 233 N.Y. 413, 416, 135 N.E. 834; Atlas Shoe Co. v. Lewis, 202 App.Div. 244, 195 N.Y.S. 618.

But even though the plaintiff is correct that under the contract title passes upon delivery to the carrier, it is not excused from making at least adequate delivery to such carrier; and according to section 46 of the Uniform Sales Act, N. Y. Personal Property Law, § 127, subd. 2, the seller is required to make such contract with the carrier "as may be reasonable, having regard to the nature of the goods and the other circumstances of the case." Consequently even this limited obligation of plaintiff required it to make a contract with the steamship company, by which the latter would agree to carry the lumber below deck. See Companhia De Navegacao Lloyd Brasileiro v. C. G. Blake Co., 2 Cir., 34 F. 2d 616. Though plaintiff appears to intimate that it had such a contract with the carrier, it has shown nothing of the kind and obviously had nothing with the shipping company of a binding nature, for it immediately gave way when only limited facilities were supplied and was ready to take whatever was offered. It is clear, therefore, that plaintiff had not fulfilled its obligation to deliver under the contract.

Plaintiff further seeks to excuse its failure to perform by claiming that it could not deliver the goods as required, because no ships were available. Although this claim is disputed by defendant, the factual issue need not be decided, for even had there been no ships available, plaintiff was not, under the circumstances of this case, excused from performance. For plaintiff's letters indicate clearly that at the time of the making of the second contract it was aware of the fact that boats were at a premium. Indeed, it pressed for the second contract largely because it expected that additional shipment to facilitate its procuring a ship. There was no startling change in conditions. The war in Europe had been under way for more than a year, and Pearl Harbor was still in the future. Neither the United States nor any of the South American countries entered the war for a year or more after the making of the contract. Hence the lack of ships in January, 1941, was a foreseeable risk which plaintiff willingly took upon itself; and it cannot under such circumstances plead the defense of "force majeure." Companhia De Navegacao Lloyd Brasileiro v. C. G. Blake Co., supra, 34 F.2d at page 619. Nor does the fact that plaintiff had to obtain government permission in order to enable it to hire a carrier excuse its nonperformance. Stand-

ard Oil Co. of New York v. Central Dredging Co., 225 App.Div. 407, 233 N.Y.S. 279, affirmed 252 N.Y. 545, 170 N.E. 137. The uncontested facts, therefore, show a clear breach of contract on plaintiff's part.

What has already been said concerning the seller's obligation ultimately to meet the cost of transportation under a c. & f. contract also leads to the conclusion that plaintiff is not entitled to a refund of defendant's deductions for extra freight charges. Plaintiff contends that, in view of the terms of the first contract quoted above, defendant was entitled to deduct only $12 per 1,000' from the purchase price to pay the freight. But the order is primarily a c. & f. contract; and here the provision for payment in New York for the seller's account of freight charges of $12 per 1,000' can, therefore, be construed only as estimates of freight charges made in order to compute the amount of the letter of credit against which plaintiff was permitted to draw. This is the construction actually made by plaintiff as a ground for increasing the price under the second contract and later for treating it as at an end and refusing to do further business unless the increased freight rates were chargeable to the buyer. The various letters indicate full realization upon plaintiff's part that it had assumed the risk of increased freight rates. The District Court, therefore, correctly held that plaintiff was not entitled to a refund of the additional freight charges of $4.08 per 1,000' actually made by defendant and charged by it against the purchase price.

Plaintiff finally objects to the award of damages for breach of contract against it on summary judgment. It attacks an affidavit by defendant's president that it was practically impossible to obtain Brazilian lumber in New York in January, 1941, and thereafter, and that the price of American lumber was not less than $65 for 1,000'; and it claims the right to cross-examine this gentleman on his assertions. But it is clear that this was not the measure of damages, and that it was not the basis used below. It is settled that the damages must be the difference in market value and contract price at the time and place of delivery, Segall v. Finlay, supra; Saxe v. Penokee Lumber Co., 159 N.Y. 371, 377, 378, 54 N.E. 14; Orester v. Dayton Rubber Mfg. Co., 228 N.Y. 134, 137, 126 N.E. 510; N. Y. Personal Property Law, § 148,

plus here the additional cost of the freight to New York, since these charges were assumed by the plaintiff.

■ The District Court accepted a statement by plaintiff in its letter of January 9, 1941, "Our FOB price is on the basis of $28.00 per 1,000 sq. ft." as fixing market value, and, adding to it the freight charge of $33.13 as stated in this letter and repeatedly in other letters of plaintiff claiming cancellation of the contract, deducted the contract figure of $40 per 1,000'—which included the $14 allowance for freight—to obtain the damages of $5,282.50 which it allowed. We think the court properly accepted plaintiff's own figure for freight charges of $33.13, used by plaintiff as the basis of its repudiation of the contract, thus repeatedly stated and never challenged nor other figure ever suggested. The summary judgment procedure under Federal Rules of Civil Procedure, rule 56, 28 U.S.C.A. following section 723c, as we said in Engl v. Ætna Life Ins. Co., 2 Cir., 139 F.2d 469, 472, "is intended to permit 'a party to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of fact to be tried,'" quoting 3 Moore's Federal Practice 3175 and citing authorities. The utility of the procedure in laying bare the real issues in an action would be manifestly impaired if plaintiff could force a trial in New York, far from the scene and the evidence fully available to it, with no indication whether or how it intends to dispute the statements it has made and acted upon.

■ This accounts for damages of the difference between the allowed-for and the actual freight charges, i. e., $29.13 per 1,000'; the additional award of $2 per 1,000' comes, of course, from the court's acceptance of the f. o. b. price at $28 per 1,000' as stated in plaintiff's letter of January 9. Since this involves reliance on a single admission, rather than a series of admissions, by plaintiff, this part of the award may be thought more doubtful, though in the opinion of a majority of the court doubt can in no event extend farther than to the additional $500 thus awarded. For all the earlier negotiations, as well as the agreed price of both contracts—a proper evidence of value, Parrott v. Allison, 2 Cir., 145 F.2d 415; United States for Use of Susi Contracting Co. v. Zara Contracting Co., 2 Cir., 146 F.2d 606—were on the basis of $26 per 1,000' of naturally dried lumber at Brazil, deducting the allowance for freight charges. Hence a valuation at this figure would certainly be fair to the plaintiff, particularly in the light of the rising market shown by the course of negotiations and plaintiff's letter of January 9. And the same conclusion would result from a decision that of the two items of damage here claimed, only that involving the freight charges had been proved.[1]

■ But we are disposed to conclude that no reason appears for a different treatment of this item than of the other, or for finding error in a judgment which treats them alike. That this was a definite and clear-cut admission, made at or about the time of breach,[2] seems clear. Thus plaintiff said specifically, "As a matter of fact, from now on we will only accept business on FOB basis and we will close the freight space and its rate at the conditions that may prevail at the time." No explanation or contradiction of this price was made by plaintiff in its papers on the original motion. But even more important, it was heard on an extensive reargument, a considerable part of which concerned the court's computation of damages. In its affidavit on reargument plaintiff accepts the computation as based on its statement of January 9 and, indeed, quotes that letter in full, then recites its quotations of prices during the negotiations (as above indicated), and then, without in any way attacking the figures themselves, raises anew the legal question of liability for the excess freight we have considered

---

[1] Since there is no contention or suggestion that the market price was falling, there is no occasion to consider whether plaintiff might be entitled to prove a potential gain to defendant by the breach as a possible offset to the loss on freight charges—a suggestion perhaps rather doubtful, in view of the separate nature of these contract items. Beinhauer v. Gleason, 48 Hun 614, 15 N.Y.St.Rep. 227, 235, affirmed 119 N.Y. 658, 23 N.E. 1150.

[2] The parties had extended the date of performance from December 31, 1940, to expire January 31, 1941; and the District Court has found the breach complete at the latter date, and has awarded interest from it. As a matter of fact, plaintiff requested cancellation in its letter of January 9, protested further on January 22, and definitely repudiated the contract January 23, 1941, in a letter repeating the objections made before.

above. It seems not to be doubted that plaintiff has never had any intention of attacking its own figures; at the very least there has certainly been no attempt, or even suggestion of an attempt, to "condescend upon particulars," as the procedure requires. Wallingford v. Directors, etc., of Mutual Soc., 5 App.Cas. 685, 704, quoted in Mr. Justice Shientag's authoritative monograph, Summary Judgment, 1941, 78, 4 Fordham L.Rev. 186, 207, and in the Engl case, supra, 139 F.2d at page 473.

 Here the analogy suggested in Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 624, 64 S.Ct. 724,[3] of evidence which "would require a directed verdict for the moving party" is useful. But care should be taken to make the analogy as exact as circumstances permit; the ruling is to be made on the record the parties have actually presented, not on one potentially possible. Hence the case here is as though defendant had offered plaintiff's admissions, and plaintiff had then rested, with no contradiction or rebuttal of any kind, and had made its own motion for a directed verdict or peremptory instruction. And the ruling in Pence v. United States, 316 U.S. 332, 340, 62 S.Ct. 1080, 1084, 86 L.Ed. 1510, would seem applicable: "No evidence in the case served in any way to contradict, qualify, or explain Pence's admissions. We are of opinion that, in the absence of any such evidence, his admissions established so overwhelming a case in favor of the Government as to require the direction of a verdict in its favor." See also Chesapeake & O. R. Co. v. Martin, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983; Brady v. Southern R. Co., 320 U.S. 476, 480, 64 S.Ct. 232, 88 L.Ed. 239; Galloway v. United States, 319 U.S. 372, 396, 63 S.Ct. 1077, 87 L.Ed. 1458; Hull v. Littauer, 162 N.Y. 569, 572, 57 N.E. 102; Princess Furnace Co. v. Virginia-Carolina Chemical Co., 4 Cir., 215 F. 329.

Judgment affirmed.

FRANK, Circuit Judge (dissenting).

I dissent with respect to the decision awarding damages to the buyer (defendant) on its counterclaim because I think my colleagues are stretching Rule 56 as to summary judgments far beyond what the Supreme Court intended in promulgating that Rule. That intention the Supreme Court put beyond question when it said in Sartor v. Arkansas Natural Gas Co., 321 U.S. 620, 624, 64 S.Ct. 724, 727, that "at least a summary disposition of issues of damage should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party." To make clear my reasons for thinking that my colleagues are disregarding that admonition, it is first necessary to discuss their rulings as to damages and as to the alleged "admission" made by the seller (the plaintiff).

1. The purpose of awarding damages, in situations like that in the instant case, is to put the buyer in as good a position as he would have been had the seller performed his obligations under the contract.[1] But the buyer, if he wishes more than nominal damages, has the obligation of showing to what extent he has actually been damaged.[2] Thus, here, the buyer must show that, if it had paid the contract price and the seller had delivered the goods in Brazil and if they had been shipped to New York, the seller paying the freight as it agreed to do, the cost to the buyer would have been less than if the buyer, on the delivery date, had bought the goods in Brazil and had shipped them at its own expense to New York.

The loss in the present case, therefore, must be computed in this manner: To (a), the amount by which the market price in Brazil at the time and place for delivery per contract exceeded the contract price at that time, there must be added (b) the cost of freight to New York, which the seller agreed to pay. If (a) is zero, then the loss

---

[3] Sartor v. Arkansas Natural Gas Corp., supra, reversed the award of damages on summary judgment; the case was quite different, however, from that here at bar, turning, among other things, on the evaluation of expert testimony, and it is not to be taken as a bar to such an award in a proper case. See Notes to F. R. C. P., Rule 56, Preliminary Draft of Proposed Amendments, 1944, 67; 7 Fed.Rules Serv. 974; 3 Moore's Federal Practice 3175, 3186, 1944 Cum.Supp. 246.

[1] It is a "fundamental principle that damages are only to provide indemnity."

Weirton Steel Co. v. Isbrandtsen-Moller Co., 2 Cir., 126 F.2d 593, 594; Potts v. Village of Haverstraw, 2 Cir., 79 F.2d 102, 105; Ed. S. Michelson, Inc. v. Nebraska Tire & Rubber Co., 8 Cir., 63 F.2d 597, 601.

[2] 1 Sedgwick, Damages, 9th Ed.1913, § 170; Burke, Kuipers & Mahoney v. Dallas Dispatch Co., 253 App.Div. 206, 1 N.Y. S.2d 674; Tinsley v. Jemison, 2 Cir., 74 F. 177; Oklahoma Natural Gas Corporation v. Municipal Gas Co. of Muskogee, 10 Cir., 113 F.2d 308.

is (b). But if (a) is less than zero—if the contract price exceeds the market price—then the loss is less than (b); indeed, it may be zero or less. I cannot see how the buyer can recover merely by proof of (b), since the loss cannot be ascertained unless both (a) and (b) are known.

My colleagues make the curious suggestion that the buyer is entitled to a judgment for item (b) unless the seller introduces proof by way of what my colleagues call an "offset," through evidence as to item (a). Surely there is no such rule. The buyer has the burden of proving that he suffered a loss, and that loss here is a unitary fact.[3]

2. In excusing the buyer here from making any showing as to (a)—the market price in Brazil—my colleagues reason thus:

(A) The contract price, they say, is some evidence of the market price. I agree. It could be the basis of an inference which, had the case gone to trial, a jury could have drawn. But surely that evidence is not conclusive even as to the market price at the date when the contract was made; for the seller may have made a good bargain (i. e., may have contracted to sell at a price well above the market). On such evidence, the court, after a trial, could not, I think, have directed a verdict for the buyer on the damage issue. Moreover, here the breach occurred several months after the contract was made.

(B) Presumably because they recognize the insufficiency of such evidence, my colleagues fall back on what they call the seller's "clear-cut admission," which they purport to find in its letter of January 9, 1941, to the Brazilian Mines & Timber Corporation, the intermediary. That letter is not an admission. It purports to be only a statement of the seller's price, not the market price. The suggestion of an increase was based solely on the increase in the cost of the freight transportation; the letter did not discuss or intimate anything whatever as to the market price in Brazil of the lumber itself. From the context of the letter, the quotation of price appears to be set forth either as a supporting argument (together with the increased freight charges) for its request for cancellation or as a suggestion for novation (compare the statement that "from now on" the seller would accept business only on an F. O. B. basis, with the buyer responsible for the freight), or as both.

The most that can be said is that the seller, when seeking to re-negotiate the item of the freight cost, remained silent as to the contract price of the lumber itself. Surely there is no justification for saying that such conduct comes within the doctrine of admission by silence; that doctrine covers only situations, unlike that here, where a party by failure to dissent acquiesces in a statement made in his presence, or makes an evasive response to a direct question, or the like.

At best, the letter and negotiations are merely some evidence from which an inference might properly be drawn by a jury. Such an inference is not compulsory, especially as the letter and negotiations occurred on or prior to January 9, 1941, and the critical market price, if we accept the trial judge's finding as to the date of the breach, is as of January 31.[4] In a fluctuating market the price may well have fallen drastically in that interval.

The cases cited in the majority opinion are therefore not in point: In Pence v. United States, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510, the court sustained a verdict directed against the plaintiff (in the same position as the buyer on its counterclaim here) because plaintiff's decedent had made, under oath, unequivocal admissions against his interest completely at variance with his claim. Again in Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 1084, 87 L.Ed. 1458, a directed verdict against a plaintiff

---

[3] The case cited in the majority opinion, Beinhauer v. Gleason, 48 Hun 614, 15 N. Y.S.Rep. 227, 235, completely fails, I think, to justify my colleagues' "offset" suggestion. There in a suit by a contractor for money due him under a contract for the erection of a building, the contract provided that if the contractor deviated from the contract, the difference for work omitted should be deducted from the amount otherwise due under the contract. The evidence showed that the plaintiff, the contractor, had omitted to install wash-trays, the value of which was about $200. It was also shown that the plaintiff had installed a better trim in the main hall and more panels in the parlor-doors than the contract required. There was no evidence that the defendant had agreed to make payment for such improvements. The court merely held that the plaintiff did not have a right to set off an item not provided for by the contract.

[4] The majority opinion refers to a repudiation on January 23rd; but negotiations between the parties continued into March.

was sustained because he had not been able "to demonstrate by more than speculative inference" the facts necessary to support his claim. In Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232, the court sustained a decision reversing a judgment for the plaintiff because there was clearly insufficient evidence to justify the verdict rendered in plaintiff's favor. In Hull v. Littauer, 162 N.Y. 569, 57 N.E. 102, a directed verdict was sustained against the plaintiff, a seller under a contract of sale of goods, where he offered no evidence whatever with respect to the terms of the contract and the wholly uncontradicted testimony offered by the defendants showed that there was an entire contract only part of which had been performed by plaintiff. In Princess Furnace Co. v. Virginia-Carolina Chemical Co., 4 Cir., 215 F. 329, at page 333, a directed verdict for damages was affirmed where the evidence for the plaintiff was undisputed and the problem of assessing damages was "a mere matter of calculation from definite and certain data."

3. My colleagues thus are here making a remarkable ruling: a court on a summary judgment motion has the power to treat a permissible inference as conclusive, although the court could not have done so had the case gone to trial. To put it differently, my colleagues are saying that a court on a motion for summary judgment has far wider power to dispense with a jury than after a trial—and that, too, on the issue of damages despite the Sartor case.

Moreover, if the seller here had not pleaded to the counterclaim but had defaulted, the trial court would have been required to call a jury on the issue of damages. Rule 55(b) (2). I cannot believe that, had the buyer then offered evidence before the jury consisting only of what now appears in this record, a jury verdict for more than nominal damages could have been sustained. If this is correct, then the seller in this case is worse off because it responded to the summary judgment than if it had allowed itself to be defaulted. That conclusion seems passing queer to me.

My colleagues' basic reason for their decision appears to be this: The seller should have disclosed in its affidavits any evidence it had which bore on the question of market price; its silence should therefore be penalized. In other words, to induce dis-

covery, my colleagues are using a harsh rule on a motion for summary judgment. I think such a device is improper. I favor liberal rules for discovery.[5] But since it can be had directly—by examination before trial, answers to interrogatories, and the like—I see no reason for springing on the seller here an indirect method, no excuse for employing a threat of summary judgment as a sort of rack or thumb-screw to bring about disclosure of evidence. I think the majority decision is unfair to the seller and creates an unfortunate precedent improperly magnifying the power of a trial judge.

---

5 See, e.g., Hoffman v. Palmer, 2 Cir., 129 F.2d 976, 997.