HAWTHORNE STEEL CORPORATION, Appellant-Respondent, v. ARLINGTON STEEL CORPORATION, Respondent-Appellant.

First Department, July 3, 1956.

*Frank Kreitzberg* of counsel (*Robert Siegel* with him on the brief; *Siegel & Markel,* attorneys), for appellant-respondent.

*Norman Winer* of counsel (*Nathan, Mannheimer, Asche & Winer,* attorneys), for respondent-appellant.

BREITEL, J.   The learned Special Referee, after a nonjury trial, rendered judgment in favor of plaintiff for nominal damages for nondelivery in an action based upon the sale of 400 tons of French steel.   Plaintiff appeals on the ground that compensable damages should have been awarded.   Defendant appeals on the ground that the complaint should have been dismissed.

The complaint was properly sustained in view of the proof, but compensable damages for nondelivery should have been awarded to plaintiff.

Plaintiff is the assignee of Runnymede Iron & Steel Corporation.   Runnymede, however, is not the original purchaser but, it is claimed by plaintiff, was substituted as the purchaser in place of the original buyer, Baird Steel Corporation.   The seller is defendant Arlington Steel Corporation.

In the fall of 1950, after the outbreak of the Korean war, Baird, by written order accepted by the seller, purchased 400 tons of French steel at a price of 7¼ cents per pound against letter of credit to be issued.   This order was dated August 22, 1950.   The proof shows that on September 8, 1950 arrangements were effected for a letter of credit to be issued by a Canadian bank, on the application of Runnymede, in favor of the seller. Notification of the issuance of such letter of credit was cabled to the Canadian bank's correspondent bank in France, which in turn notified the seller, then in France, in writing.   The seller testified that in reliance upon such notification it ordered the steel to fulfill the order from a French mill.   Thereafter there were further exchanges of cables between Baird and the seller with reference to the order, now covered by the Runnymede letter of credit and Runnymede order.   The seller never delivered the steel, and, on November 1, 1950, after delivery was due, the seller notified Baird, the original buyer, that all licenses to export steel had been suspended in France.

On the matter of damages the contract provided for delivery in New York in October.   It was shown that domestic steel was selling in the New York market during the times in question at 5¼ cents per pound, although the undisputed proof is that imported foreign steel was bringing 11 to 13 cents per pound.

There are three questions in the case. The first is whether the letter of credit was issued in time and whether it was adopted by the seller to cover financing of the sale. The second question is whether Runnymede was substituted as the buyer for the steel in place of Baird, giving rise to a substituted contract of sale in place of the original contract of sale between Baird and the seller. The third question is whether plaintiff, assignee of Runnymede, proved damages sustained by Runnymede.

Concededly, Baird was unable to obtain the letter of credit to finance the purchase of the French steel. It notified the seller of difficulties in obtaining such letter of credit. Before the time to produce a letter of credit, namely, September 11, as extended by the seller, Baird arranged, in Toronto, Canada, for the purchase of the steel by Runnymede, a Canadian corporation. This was done on September 8, and there is an order received in evidence purporting, on behalf of Runnymede, to order the same quantity of steel at the same price from the seller. There is dispute whether this order was actually received by the seller, but there is evidence that it was sent.

Undisputedly, on the same date which the Runnymede order bears, Runnymede applied for and obtained a letter of credit to be issued by a Canadian bank in favor of the seller. Concededly, notice of the issuance of this letter of credit, although not the original document, was received by the seller, which thereupon ordered the steel from a French mill.

In further proof of the adoption of the Runnymede letter of credit there is testimony by Baird that the person who, as secretary for the seller corporation, accepted in writing Baird's original order, orally agreed that a letter of credit from Runnymede would be satisfactory, and that Runnymede should be substituted as a purchaser in the place of Baird. Moreover, in addition to this testimony, and the seller's admission that the steel was ordered on the basis of the letter of credit, there was a cable by Baird, on October 31, 1950 referring to the original Baird order and to the Runnymede arrangement, all of which was inartistically described as " RE OUR ORDER 1080, AUGUST 22 D CREDIT VIA RUNNYMEDE TORONTO GUARANTEED BY THEIR ORDER 1686 ". It was in response to this cable that the seller answered, on November 1, 1950 that licenses had been suspended, but that the steel would be shipped as soon as licenses were available.

On the foregoing proof, much of it out of the mouth of the seller, it is conclusive that the Runnymede letter of credit was adopted by the seller in performance of an agreement for purchase and sale of steel. Plaintiff contended that there never was any objection raised to the letter of credit, its form,

or its timeliness. While this is disputed by the seller, the contradiction is only partial and greatly qualified. Indeed, in September, the seller testified, Baird was advised by the seller, after some objection, that it would try to ship the steel on the Runnymede letter of credit.

Whether in addition to the adoption of the letter of credit there was also a novation or substitution of a new contract with Runnymede as the buyer in place of Baird is a closer question. On this question, however, the learned Special Referee was entitled to find, on substantial evidence, that the intention of the parties, as manifested by their conduct and the documents, and sufficiently to satisfy the Statute of Frauds, established a mutually binding substitution, with Baird acting on behalf of Runnymede (6 Corbin on Contracts, § 1293 et seq.; Crabtree v. Elizabeth Arden Sales Corp., 305 N. Y. 48), long before the seller's cable of November 1, 1951. Consequently, judgment was properly rendered in favor of the plaintiff as assignee of Runnymede.

The next and last question in the case turns on whether actual damages were established. The proof as presented by the witnesses, including an expert for plaintiff, is undisputed, that in the fall of 1950 domestic steel of the type involved was available at 5¼ cents per pound. At that time, in the New York market, imported foreign steel of the same type was commanding a price of 11 to 13 cents a pound. Indeed, this differential explains, as argued by plaintiff, why Baird ordered foreign steel at the price of 7¼ cents per pound, and pressed for delivery during months when domestic steel was selling at lower prices.

The background events explain what happened at this point in the relationship between the seller and the buyer. The Baird order was dated August 22, 1950. As the Korean war progressed various strategic materials, including steel, were in short supply. Rising prices and hoarding tendencies impended. On September 8, 1950 the Defense Production Act of 1950 was enacted (U. S. Code, tit. 50, § 2061 et seq.). On September 9, 1950, Executive Order No. 10161, in implementation of the statute, was propounded (15 Federal Register 6105). On September 18, 1950 there took effect a regulation of the National Production Authority (15 Federal Register 6253–6255). Under this regulation restrictions on the purchase, shipment and delivery of steel in order to prevent hoarding were provided. Imported steel was affected but not to the same degree as domestic steel. Thus, it was provided that foreign steel could be imported in excess of inventory restrictions, but it was also

provided that in such event domestic steel could not be added beyond an inventory limit inclusive of such imported steel. The significant thing, however, was that even when the inventory restriction was exhausted, under some circumstances, additional foreign steel could be imported. Shortly after, on September 29, 1950, further regulations were adopted affecting priorities in the purchase of steel at domestic mills (15 Federal Register 6632–6636). These various regulations were not limited to original purchases but, except for consumers, covered subsequent resales.

A consequence was that with respect to domestic steel, as compared with foreign steel, the regulatory conditions were more onerous. This obviously must have, and apparently did, influence the domestic prices of domestic and foreign steel. Because of its origin domestic steel was not as unlimited as to use or storage, and because of its origin transactions with respect to it were open to official inquiry, including possible implication in crime. On the other hand, foreign steel was subject to freer dealing in the domestic market. The effect, therefore, was to establish a price differential between domestic and foreign steel, or at least so the proof showed. This may consequently establish a differential in market values despite the physical identity of the steel involved (cf. *Tilatitsky, Inc.*, v. *Raymond-Hadley Co.*, 126 Misc. 585; *Orester* v. *Dayton Rubber Mfg. Co.*, 228 N. Y. 134; see, also, *Madeirense Do Brasil S/A* v. *Stulman-Emrick Lumber Co.*, 147 F. 2d 399, 403. Each of these cases is easily distinguished from this, but they do indicate that the law looks to the interplay of economic factors rather than merely to the physical constitution of commodities in determining measure of damages).

The Special Referee found no proof of damage, because it had not been shown that Runnymede, a Canadian corporation, would not have been able to obtain domestic steel at domestic mills. Thus, it was viewed that Runnymede could have made itself whole by the purchase of domestic steel, then selling at a price lower than the contract price.

The situation in domestic steel, however, was irrelevant. All of the parties involved in this transaction were traders in steel. They were middlemen. None was purchasing steel for use. Under these circumstances, foreign steel, largely unrestricted as to use or storage, could, and evidently did, command a higher trader's price. The only comparable substitute for the steel that was not delivered by the seller was similar, relatively unrestricted, imported steel.

128

Consequently, the measure of Runnymede's damages was the difference between the contract price and the price of foreign steel in the New York market, namely, the price of 7¼ cents, the contract price, and 11 cents per pound, the lowest price commanded in the New York market by foreign steel during the month of October, 1950, when delivery should have been effected (Personal Property Law, § 148).

Accordingly, plaintiff, assignee of Runnymede, is entitled to judgment for compensable damages. The judgment should be modified on the law and on the facts to award plaintiff damages in the sum of $30,000, and should otherwise be affirmed, together with the costs and disbursements of this appeal. Settle order.

FRANK, VALENTE and BERGAN, JJ., concur with BREITEL, J.; PECK, P. J., dissents and votes to affirm.

Judgment modified so as to award plaintiff damages in the sum of $30,000 and otherwise affirmed, together with the costs and disbursements of this appeal. Settle order on notice.